**WOOD PRODUCTS DEVELOPMENT CO., Inc., a corporation of Tennessee, and Tibbals Flooring Company, a corporation of Tennessee, Plaintiffs,**

v.

**CLOUD OAK FLOORING COMPANY, a corporation of Missouri, Cloud Flex-Block Floor Company, a corporation of Missouri, Lombard Oak Corporation, a corporation of Delaware, Cloud Investment Company, a corporation of Missouri, Drabmol Oak Corporation, a corporation of Missouri, and Cloud Oak Flooring Company, a corporation of Missouri, Defendants.**

Nos. 2057, 2058.

United States District Court
W. D. Missouri, S. D.

Nov. 2, 1966.

Supplemental Findings of Fact, Supplemental Conclusions of Law, Interlocutory Judgment, Supplemental Memorandum Opinion and Order Jan. 25, 1967.

Supplemental Order under F.R.C.P. 60 March 13, 1967.

James L. Dooley, Washington, D. C. (William K. West, Jr., Cushman, Darby

& Cushman, Washington, D. C., J. Weston Miller, Springfield, Mo., of counsel), for defendants.

Francis C. Browne, William C. Schuyler, Andrew B. Beveridge, and Jim Zieger, Browne, Schuyler & Beveridge, Washington, D. C. (A. Ronald Stewart, Springfield, Mo., Howard H. Baker, Jr., Knoxville, Tenn., of counsel), for plaintiffs.

JOHN W. OLIVER, District Judge.

I.

The evidence was received in this case before Graham v. John Deere Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) and United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966) were decided. Those cases were handed down during the briefing stage of this case. We requested and have had the benefit of counsels' views as to the impact of those decisions on this case.

The patent cases decided by the Court of Appeals for the Eighth Circuit since Graham and Adams establish that the path generally followed in this Circuit prior to the 1952 enactment of Section 103 of Title 35, United States Code, in regard to the now codified element of nonobviousness must now be followed under the command of those recent Supreme Court decisions.

The fact that every patent involved in the post-Graham Eighth Circuit cases has been held to be invalid, some as a result of reversals of district court judgments rendered before Graham and Adams were decided, does not, by any means, suggest that no patents are to be sustained by the district courts in this Circuit.

L & A Products, Inc., et al. v. Britt Tech. Corporation et al., (8th Cir. 1966) 365 F.2d 83, No. 18275, decided August 29, 1966, notes that it would be "an over-simplification to conceive of Graham and Adams as two poles, one of which would necessarily govern each patent case when it comes under a court's scrutiny." Judge Blackmun pointed out that those two cases must be regarded "so far as the nonobviousness test is concerned, as the Supreme Court's own contribution to its indicated case-by-case development" and that other post-Graham decisions of the Eighth Circuit must be viewed in the same manner.

Piel Manufacturing Company v. George A. Rolfes Co., (8th Cir. 1966) 363 F.2d 57, notes the basic affinity between the Supreme Court's decision in Graham and the pre-Graham cases decided by the Court of Appeals of this Circuit. Selmix Dispensers, Inc. v. Multiplex Faucet Co., (8th Cir. 1960) 277 F.2d 884, and Caldwell v. Kirk Mfg. Co., (8th Cir. 1959) 269 F.2d 506, cert. denied 361 U.S. 915, 80 S.Ct. 260, 4 L.Ed.2d 185 (1959), were cited as examples of the many cases that illustrate the point.

Referring to Graham and to the two Eighth Circuit cases just mentioned, Judge Larson stated all three "decisions can be considered descendants of Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1950) * * *." (363 F.2d at 58, N. 2).

American Infra-Red Radiant Co. v. Lambert Industries, Inc. (8th Cir. 1966) 360 F.2d 977; Kell-Dot Industries, Inc. v. Graves, (8th Cir. 1966) 361 F.2d 25; Skee-Trainer, Inc. v. Garelick Mfg. Co., (8th Cir. 1966) 361 F.2d 895; and Automated Building Components v. Hydro-Air Engineering, (8th Cir. 1966), 362 F.2d 989, all reflect firm Eighth Circuit acceptance of Graham's direct holding that the rule of Hotchkiss is now codified in Section 103 and Graham's rejection of the argument that judicial precedents were intended to be swept away by Section 103 in order that the level of patentability be lowered.

Graham's declaration that the now Section 103 codified standard of Hotchkiss had "remained invariable in this [Supreme] Court" for over a hundred years (383 U.S. at 19, 86 S.Ct. at 694): its recognition that improper use of the Hotchkiss test is a label "brought about a large variety of opinions as to its meaning both in the Patent Office, in the courts, and at the bar" (383 U.S. at 12, 86 S.Ct. at 691); its recognition of "a

notorious difference between the standards applied by the Patent Office and by the courts" (383 U.S. at 18, 86 S.Ct. at 694); all contributed to the Supreme Court's firm direction to lower federal courts that "the inquiry which the Patent Office and the courts must make as to patentability must be beamed with greater intensity on the requirements of § 103 * * *." (383 U.S. at 19, 86 S.Ct. at 694).

L & A Products, Inc., supra, consistent with the rule announced in *Graham,* states the path to be followed in regard to the nonobvious requirement and leads to several basic inquiries, namely, "the determination of the scope and content of the prior art, the ascertainment of the difference between the prior art and the claims at issue, and the resolution of the level of ordinary skill in the pertinent art." (page 86 of 365 F.2d). The quotation, of course, is a direct paraphrase from 383 U.S. at 17, 86 S.Ct. 1, from *Graham.*)

Study of the file wrappers of the patents here involved reveals that primary inquiry into the basic questions of obviousness and nonobviousness was not always in focus in the processing of the patents through the Patent Office. We do not want to be understood as saying those questions were totally unnoticed. The appeal taken to the Court of Customs and Patent Appeals in connection with the Yellow patent, reported as Application of Tibbals, 1963, 316 F.2d 955, 20 CCPA 1260, for example, illustrates that Section 103 was not totally ignored by the Patent Office. But the fact that the appeal was so vigorously prosecuted in connection with the Patent Office's rejection of the Yellow patent's Claims 27 and 28 on the basis of Lindblom's prior art indicates that plaintiff was convinced he could get some appellate authority to say that Section 103 meant something different than what the Supreme Court was later to say in *Graham* that section does mean.

· In a not wholly dissimilar manner, the pre-*Graham* suggested findings of fact and suggested conclusions of law filed in this case before that case was handed down tended to give but passing attention to Section 103. In its pre-*Graham* brief, plaintiff did quote Section 103; agreed that the Eighth Circuit rule applied a "higher standard" of invention; noted that *Graham* and the other cases were then pending on certiorari; but argued generally that under the Eighth Circuit rule the patents were valid. *Hotchkiss* was not cited.

Defendant in its pre-*Graham* brief described this case as "primarily a 'fact case' which presents a 'fact' controversy." Some attention was directed to the question of obviousness but the beam of inquiry was not focused with the intensity subsequently required by *Graham.* Defendant initially requested 251 findings of fact before *Graham;* plaintiff, 51.

In briefs filed after *Graham,* defendant requested over 70 additional findings of fact. Plaintiff filed a 27 page appendix to its brief in which the prior art and the Section 103 questions were fully discussed. Neither party, however, suggested that any of the pre-*Graham* requests for findings be withdrawn. In order therefore to ascertain the areas of real factual dispute we required counsel to indicate their specific agreement or disagreement with the particular findings requested by the other. In the event of disagreement, counsel were required to give citations to the transcript and to particular exhibits or portion of particular exhibits to support their respective positions.

Our findings of fact reflect the pattern established by the procedures described. We are fully cognizant of the fact that some of the findings will sound in "patentise language," to borrow Judge Mehaffy's phrase in Kell-Dot Industries, Inc. v. Graves, (8th Cir. 1966) 361 F.2d at 29. For the most part we have adopted such language only where the parties have indicated their substantial agreement with a particular requested finding. We would not have made many of the findings requested except for the fact opposing counsel did not object. We are inclined to believe that many of the re-

quested findings have but peripheral importance to the case and have the effect of planting rows of small trees that tend to obscure the forest.

It is not improbable that practice before the Patent Office, involving as it does arguments over language that would equip one to argue with Schoolmen about the number of angels that can stand on a pinhead, has affected the flood of words this case has produced. On the other hand, Judge Learned Hand's observation before a Senate Judiciary Subcommittee in 1955 quoted by Harris in "Section 103 Revisited," (IDEA: Patent, Trademark, and Copyright Journal of Research and Education, Vol. 9, No. 4, pages 617–634, Winter 1965–1966) must not be overlooked. Hand said that patents and inventions were "a subject on which judges loved to be rhetorical." Perhaps judicial verbosity in patent cases has not been without influence on the Bar.

At any rate, the findings made in this case are a combination of those generally agreed to by the parties; those suggested by one of the parties, a particular part which I have accepted but parts of which I have modified in accordance with what I believe to be a proper factual finding; together with still other findings made without the suggestion of either side. In regard to findings that relate to prior art, I have sometimes added an example or examples of that art by reference to a particular patent which I believe to be pertinent. I may also add that in resolving all conflicts in the evidence I have refreshed my recollection by reading the transcript and by further study of all exhibits offered in evidence, all in the light of the arguments presented orally and in the excellent briefs filed by both parties.

## II.

### FINDINGS OF FACT

1. This is a suit under the patent laws wherein the defendants are charged with patent infringement.

2. The plaintiff Wood Products Development Co., Inc. (hereinafter called "Wood Products") is a corporation of the State of Tennessee, having its principal place of business at Oneida, Tennessee.

3. The plaintiff Tibbals Flooring Company (hereinafter called "Tibbals Flooring") is a corporation of the State of Tennessee, having its principal place of business at Oneida, Tennessee.

4. All of the patents now in suit issued to Wood Products, as assignee, on applications originally filed by Mr. Charles Tibbals, who is the President of and the majority stockholder in Tibbals Flooring.

5. Wood Products was organized for Mr. Tibbals by Mr. Howard Baker, who is general counsel of and an officer of Tibbals Flooring, in early 1960 for the purpose of holding title to, administering, and licensing the patents expected to issue on a number of patent applications then pending before the Patent Office under an arrangement wherein Mr. Tibbals is paid 80% of the net profits prior to taxes, and, further, as a holder of 20% of the stock in that corporation, participates to that extent in the corporate profits after taxes. Mr. Baker is the President of, and a director of, Wood Products. The other officers and directors are a retired employee of Tibbals Flooring, an accountant retained by Tibbals Flooring, and Mr. Tibbals' brother.

6. Mr. Tibbals is not an officer or director of Wood Products but acts as a "consultant" for this company.

7. Upon the organization of Wood Products, and the recording of the transfer of title to the pending Tibbals patent applications from Mr. Tibbals to that company, Wood Products issued a formal royalty-bearing license under those patent applications, and any patents issuing thereon, to Tibbals Flooring. The apparatus, method and products covered by these patent applications were developed by Mr. Tibbals. The issuance of the "license" to Tibbals Flooring under these circumstances was not an arm's-length transaction.

8. The defendant Cloud Oak Flooring Company, first listed in the caption of

this case, was, at the time of the institution of this litigation, a corporation of the State of Missouri, having its principal place of business in Springfield, Missouri. The term "Cloud Oak (I)" will be used hereinafter to refer to the activities of this corporation prior to its change of name. This corporation is now, by change of name, the Cloud Investment Company which is listed in the caption of this case.

9. The defendant Cloud Flex-Block Floor Company (hereinafter called "Cloud Flex-Block") was, at the time of the institution of this litigation, a Missouri corporation having its principal place of business at Springfield, Missouri, and was a wholly-owned subsidiary of Cloud Oak (I). It merged with defendant Lombard Oak Corporation.

10. The defendant Lombard Oak Corporation is a Delaware corporation, having its principal place of business at Springfield, Missouri.

11. The defendant Drabmol Oak Corporation is a corporation of Missouri having its principal place of business at Springfield, Missouri. It changed its name to Cloud Oak Flooring Company, the second Cloud Oak Flooring Company mentioned in the caption of this suit, which corporation will hereinafter be referred to as Cloud Oak (II).

12. At the time of the institution of this action, Cloud Oak (I) owned and Cloud Flex-Block operated the parquet floor block manufacturing machinery to which the charge of infringement relates (hereinafter termed "accused machine"), and sold the parquet flooring block, which it manufactured, to Cloud Oak (I) who, in turn, distributed the blocks through trade channels. During the course of this litigation there were a series of corporate reorganizations; Lombard Oak Corporation now owns the machinery in question and leases the same to Cloud Oak (II), which operates the machinery and sells the parquet flooring blocks, so manufactured, to the trade.

13. This action was instituted on March 16, 1963 when Cloud Oak (I) and Cloud Flex-Block, acting as co-plaintiffs, instituted Civil Action 4673 in the United States District Court for the Eastern District of Tennessee against Wood Products, seeking declaratory judgment that neither of them infringed the patent to Tibbals, No. 2,650,627, issued September 1, 1953 (hereinafter referred to as the "red patent"); the patent to Tibbals, No. 2,961,021, issued November 22, 1960 (hereinafter called the "blue patent"); the patent to Tibbals, No. 2,983,295, issued May 9, 1961 (hereinafter referred to as the "black patent"); and Tibbals Patent No. 2,983,361, issued May 9, 1961 (hereinafter referred to as the "green patent"); and further seeking declaratory judgment that those patents are invalid and unenforceable; and, finally, seeking an award of costs and attorney's fees.

14. Wood Products filed an answer and a counterclaim charging Cloud Oak (I) and Cloud Flex-Block with infringement.

15. Wood Products did not, in fact, own the red patent. Title to that patent resided in Tibbals Flooring. Cloud Oak (I) and Cloud Flex-Block instituted Civil Action No. 4750 in the United States District Court for the Eastern District of Tennessee on July 9, 1963 against Tibbals Flooring, seeking declaratory judgment that neither of them infringed the red patent, that the red patent is invalid and unenforceable, and that there should be an award of costs and attorney's fees.

16. On April 8, 1964, the Tennessee Court transferred both actions to this Court, where they were given No. 2057 and No. 2058, respectively. They have been treated as a single action by this Court.

17. As this is an action under the Patent Laws of the United States, there is no question about this Court's jurisdiction over the subject matter, and all parties have waived any objections to this Court's jurisdiction over the persons and/or the present venue of this action.

18. Tibbals' patent No. 3,118,804, was issued January 21, 1964 (hereinafter

called the "yellow patent") to Wood Products and Tibbals' patent No. 3,128,511, issued April 14, 1964 (hereinafter called the "brown patent") was issued to Wood Products.

19. Subsequent to the issuance of the yellow patent and the brown patent, Cloud Oak (I) and Cloud Flex-Block filed motions to amend their complaint against Wood Products to bring those patents into the litigation for a declaration of non-infringement, invalidity and non-enforceability. At the request of the Court the pleadings of the respective actions were recast with Wood Products and Tibbals Flooring Company as plaintiffs. The "new" plaintiffs filed a combined complaint in Civil Actions No. 2057 and No. 2058, charging the defendants listed in Findings 8 through 11 with individually and collectively infringing specified claims of the patents still in suit, i. e., Claims 1–2 of the red patent, Claims 9 and 10 of the blue patent, Claims 1, 4, 6, and 12 of the black patent, Claims 2 and 3 of the yellow patent, and Claims 1–4 of the brown patent.

20. Pursuant to another agreement, reached at that pretrial conference, that the green patent was not infringed, the parties also filed a joint motion to dismiss, without prejudice, so much of the action as pertained to the green patent.

21. The "new" defendants responded to the new complaint by denying infringement, denying that any of the claims in suit were valid, or enforceable, and then entered a counterclaim charging that the plaintiffs had unlawfully restrained trade by seeking to enforce patents known to be invalid and unenforceable in general, and unenforceable against the defendants in particular, and praying an award of triple damages.

22. The plaintiff concluded that there had been no infringement of any claim of the red patent, and the parties agreed that that patent could be withdrawn from the litigation. Defendant did not waive its claim for an award of attorney's fees expended in preparing for a trial on the red patent.

23. In the following findings, references to the prior art, or to prior knowledge of the art, refer to art or knowledge prior to any of the dates of significance in this litigation.

24. This controversy centers around the manufacture and sale of a product most commonly known as block flooring or unit block flooring, although now the product is sometimes known as parquet flooring.

25. The term parquet flooring in its original sense referred to the elaborately patterned floors made up by painstakingly forming and setting strips and other shapes of similar and/or constrasting woods to form any of an infinite number of designs. Such parquet floors have been used since the 14th Century in Europe, and from Colonial times in America, in palaces, manor houses, and the like, wherein cost, and the amount of hand labor required to install them, were matters of little concern.

26. Block flooring is a relatively new form of parquetry, apparently first introduced in the early part of this century, wherein groups of individual strips of wood (called "slats") are assembled into square or rectangular blocks at the factory and are held together by various types of retaining means installed on their backs, sides, or ends, until they are laid in their final position, at which time they are secured to the subfloor by being set in mastic. While literally scores of different types of retaining means have been resorted to through the years, they all had the same ultimate purpose of accelerating the laying of a floor which will give the desired parquet effect.

27. Historically, most block floor has been made from the "shorts" obtained in the milling of, and subsequent cutting to specified even-foot lengths of, strip flooring, i, e., the end pieces which are too short for sale as strip flooring, *per se*. Conventional practice was for block flooring to have the same thickness as one of the conventional types of strip flooring.

28. Most of the strip flooring manufactured in recent years has a tongue and

groove configuration. Blocks made from such stock have, by definition, a tongue and groove configuration on the edges paralleling the grain at the moment the block is first assembled. Conventionally, such blocks are thereafter milled to obtain similar tongue and groove configurations on the end-grain edges, and then the first mentioned tongued and grooved edges are remilled to the extent required to make the block perfectly square and of the desired final dimensions.

29. Some strip flooring is milled with a truly rectangular cross-sectional configuration, and is identified as "square edge" strip flooring. Blocks formed from such stock will not, of course, have the tongue and groove relationship between the respective slats, and will not have a tongue and groove relationship with neighboring blocks when finally laid unless all four sides are milled to the tongued and grooved configuration during the squaring operation after the block has been assembled. In this instance one end grain edge can be tongued, and the other grooved, so that the block as a whole will have a configuration similar to that of a block formed of tongue and groove material, or in the alternative, two end grain edges can be tongued with the other two edges being grooved.

30. Blocks which are tongued and grooved on their outer periphery will, when laid, have a tongue and groove relationship with their neighboring blocks, and a given block will be held flat because of the interfitting of its tongues with the grooves of its neighboring blocks and by the interfitting of the tongues of its neighboring blocks with its grooves. Stated otherwise, the interfitting of the peripherally tongued and grooved blocks will serve to overcome any tendency of an individual block to curl in response to stresses created by the particular retaining means which has been selected to hold the block together up to the moment of installation, as aforesaid. In like manner, this interfitting relationship will prevent such blocks from conforming to minor irregu-larities in the underlying floor, even if the individual blocks, standing alone, are flexible enough to do so.

31. In those instances where the slats are composed of tongue and groove stock, and it is not desired to have a tongue and groove relationship between neighboring blocks, i. e., it is desired to make a square edge block, the tongue and the groove on the respective terminal (or outside) slats must be removed during the squaring operation. Of course, if the block is made up from square edge slats, it is only necessary to square the block to the final dimension.

32. Prior to any of the dates which are significant here, the block manufacturing art has long been aware of a variety of techniques for joining together, and holding in position, the respective slats which form the completed block, including the use of staples or corrugated fasteners to secure neighboring slats to one another, and the use of various types of splines installed in grooves formed in the edges, or in the underside, of the block and extending transversely of the respective slats. Such splines have been formed from lengths of wood or metal having various shapes. The metal splines or retaining elements most commonly disclosed in the prior art were either various forms of wire (either smooth, or barbed or coated for better adhesion to the walls of the transverse groove wherein they are installed) frictionally engaged to the walls of the groove or V-shaped metal strips which are loosely inserted (legs first) into the transverse grooves and then mashed inward to spread the legs of the V and to firmly embed them into the wood of the slats which constitutes the side walls of the transverse grooves. Examples of prior art are illustrated by the Baraclough, Hughes and Allen patents in evidence.

33. Whatever may be its particular style or configuration, the retaining element or elements hold the respective slats in their proper position relative to their neighboring slats until such time as the block is installed by being pressed down

into a bed of soft mastic. Once the mastic stiffens, the respective slats, and hence the block themselves are resiliently held in situ by the mastic and the retaining elements simply lie dormant and serve no function at all. One criterion for a useful retaining member is that it be stiff enough to support the block in a reasonably flat configuration when the block is grasped by one corner, as a "limp" block would be difficult to handle and this would defeat the fundamental concept of the use of such blocks which is, as has been said, to accelerate the laying of a parquet type floor.

34. The use of V-shaped metal splines was first proposed by C. W. Allen Patent No. 1,808,623, issued June 2, 1931, based on an application which was a continuation of an application filed on June 11, 1927. In this patent Allen teaches the formation of block flooring by grouping the respective slats, forming a groove in the under surface, or "non-wear" surface, extending transversely of the slats, (which type of groove will hereafter be referred to as "transverse groove" to avoid confusion with the peripheral groove of tongue and groove slats or tongue and groove blocks), dropping a V-shaped metal spline into that transverse groove, legs first, and then pressing down on the apex of the spline with a presser to cause the legs to spread and bite into the wood constituting the corners of the groove. Allen illustrates a spline which is cut to a length which is sufficiently smaller than the transverse width of the block so that presence of such a spline will not interfere with the operation of the milling tools used to square the block after it has been assembled, as discussed above, and can not interfere with the interfitting of the respective blocks when the blocks are being laid. He also teaches that the groove and the spline must be so dimensioned that the spline, when installed in tight contact with the slats, will not protrude beyond the non-wear surface of the block, i. e., that the block will not, when installed "ride" upon the retaining element.

35. The block construction taught by Allen in this patent has been widely used by a variety of block manufacturers since the '30s in connection with blocks made of $25/32''$ stock and is still used today. This technique has been used to a lesser extent on other sizes of blocks down to and including blocks made from $3/8''$ stock.

36. The use of wire splines embedded in grooves on the underside, or non-wear surface, of a block was first proposed in Allen Patent No. 1,796,880, dated March 17, 1931, on an application filed on February 25, 1928, whose drawing illustrates a 6-inch square block formed of four $3/8''$ x $1\frac{1}{2}''$ x $6''$ tongue and groove slats and states that he believed that wire splines are preferable for use in retaining the slats of block made of such thin stock as compared with the means previously used for retaining slats made of thicker stock, apparently referring to the V-shaped splines discussed in his earlier filed application which, as stated above, matured into his patent No. 1,808,623. Allen teaches that the wire is held in place through "frictional engagement" with walls of the groove, and that the wire may, if desired, be coated with cement to give it an even better grip or engagement with the walls of the groove (page 1, lines 65–67). He specifies that the wire must reside entirely within the groove because if any portion extended vertically outside of the groove, i. e., below the non-wear surface, the block would not lie flat on the subfloor, but rather would "ride" on the wire (page 1, lines 56–62).

37–41. The first real area of dispute revolves around what would have been obvious to a person having ordinary skill in the art from an examination of one of Allen's 1931 patents for wood block flooring. Particular controversy centered around figure 7 of that patent. Plaintiff introduced Plaintiff's Exhibits 53 and 54 as fair replicas of the teaching of Allen's Figure 7. Defendant introduced Defendant's Exhibit 70 for a similar purpose.

We are unimpressed with all blocks because we are convinced that one skilled in the art would not seek to learn by such methods. The basic idea conveyed to one skilled in the art by Allen's 1,796,880 is that thin strips of wood flooring could be tied together by a wire in a groove cut deep enough to hold the wire so that, when assembled, the wire would not protrude in order to prevent the block from "riding" on the connecting wire. That idea really is as old—and as obvious—and as uncomplicated—as the countersinking of a nail, screw, or (and probably still older) a wooden dowel. Allen recognized in his 1,808,623 patent that there was no particular novelty in what sort of "ties" were to be used. Indeed, he illustrates in figures 7 and 8 of that patent two sorts of ties that could be used and significantly added that "other forms of ties than those shown and functioning in substantially the same manner will readily suggest themselves to those skilled in the art" (lines 44–47, page 2, DX-20).

Allen's 1,796,880 does show that in 1931, the problem of moisture expansion of slatted blocks apparently had not yet been solved. He stated that "thin flooring of this character is used in dry climates for new construction and can also be generally used in reflooring houses, wherein, of course, the old flooring is thoroughly dried out." In reiteration of the obvious implication of that sentence, Allen added that "thin flooring under unusual moisture conditions will cup and warp but when used under the indicated dry conditions, it is as serviceable as the thicker flooring" (lines 14–22, page 2 PX-7NN). As will be found below, the solution of the moisture problem admittedly became obvious to one of ordinary skill and a part of the prior art long before plaintiff's patents were issued. We have discussed Allen's 1931 patents in some detail at this point in order to illustrate what we believe a person of ordinary skill must be held to learn from the reading of a patent.

Findings 42 and 42A are made because the facts there found relate to something that actually happened and illustrate how one skilled in the art actually used the teaching of Allen. Those findings, as will be stated in 42A, are based primarily on the DX-21 series of exhibits, the principal exhibit being the affidavit of one Frank H. Lyons. Under ordinary circumstances, we hesitate to base findings on any affidavit where the facts can otherwise be established. The circumstances in regard to Lyons' testimony by affidavit were not ordinary. The circumstances under which Lyons' testimony was not taken by deposition are revealed in Mr. Dooley's letter of March 30, 1965; Mr. Browne's letter of March 31, 1965; Mr. Dooley's letter of April 1, 1965; Mr. Dooley's letter of April 19, 1965; Mr. Browne's letter of April 21, 1965; Mr. West's letter of April 21, 1965; and Mr. Dooley's letter of April 22, 1965. The agreement of the parties that Mr. Lyons' affidavit be received in evidence as his testimony is reflected on pages 6 and 13 of the transcript. Additional findings and inferences are stated in 42A.

42. Thin (⅜") blocks, bound with wire splines no thicker than approximately .090" in diameter, frictionally engaged in grooves in the non-wear surface, were produced and sold for a short time in the late '20s by Mr. Allen's employer, the E. L. Bruce Company, Inc., which was then, and is now, the largest wood flooring manufacturer in this country. The blocks so sold were substantially identical to those shown in the Allen Patent No. 1,796,880, the only significant difference being that they were composed of three 2¼" wide slats, and thus the block had an over-all dimension of 6¾" x 6¾" and the wire spline had a length less than the over-all width of 6¾", i. e., it only extended from a point short of the outside edge of one terminal slat to a point short of the outside edge of the other terminal slat, so as to leave sufficient clearance to avoid interference with the milling knives used to mill and square the block after it had been assembled. The spacing of the ends of the wire from the edges of the block also

served to insure against the wire's interference with the interfitting of the blocks with their neighboring blocks when the floor was laid, and, finally, insured against the possibility of any projecting wire ends that might injure the fingers of the floor layers. After a short time it was concluded by the E. L. Bruce Company that this type of block would have a better customer acceptance if constructed with the V-shaped metal splines illustrated in Allen Patent No. 1,808,623, and thereafter the Bruce Company made all of its parquet block flooring with the V-shaped splines up to a period during the Korean War, at which time a shortage of the flat steel tape used to make the V-shaped splines forced the Bruce Company to switch back to the usage of wire as employed in the late '20s, except in this instance in association with the popular 9″ x 9″ x $^{25}\!/_{32}$″ block. When the steel shortage eased, Bruce returned to the use of the V-shaped splines and has continued to use them up to the present except for a brief period in 1959 when a shortage of steel, caused by the well-known steel strike in that period, again caused Bruce to briefly reconvert to the use of wire. A sample of the $^{25}\!/_{32}$″, 9″ x 9″ block, bound with .090″ wire, as produced by Bruce during the Korean War and again in 1959, was introduced in evidence and was compared with otherwise identical blocks bound together with V-shaped spline. It is readily seen that while the latter presents a a noticeably stiffer block, the wire does have sufficient rigidity to retain the block in a substantially flat posture when it is held by one edge, as described in Finding 33.

42A. The above finding is based upon a stipulation of testimony of Mr. Frank Lyons, who is a long time employee and is now an executive of the E. L. Bruce Company, which has no interest in this litigation. At least as early as September 4, 1964, the plaintiff was advised of the defendant's intention to rely upon the Bruce activities, and the details of those activities, and the defendant's contentions as to the legal effect of those activities. Plaintiff had ample notice and opportunity to make a full investigation of the matters related in the stipulated testimony of Mr. Lyons, which were later set forth in the form of a sworn affidavit. Plaintiff did not impeach, or attempt to impeach Mr. Lyons, or challenge his credibility, or contradict it in any way. Defendant stipulated that the affidavit be considered as testimony. The Court accordingly accepts that testimony as being in all respects true and correct.

43. The reference in the Lyons' affidavit, Defendants' Exhibit 21, to a block identifies the block marked at trial as Plaintiff's Exhibit 53.

44. The evidence indicates that prior to any of the dates significant in this litigation various other American block flooring manufacturers used smooth steel wire retaining elements on different types of blocks, including blocks made up of five or more slates 1½″ wide and either $^{7}\!/_{16}$″ or ½″ thick.

45. Thus, prior to any of the dates which are significant in this litigation, the block making art knew that wire splines frictionally engaged in grooves in the non-wear surface and cut short of the terminal edges of the block, and V-shaped splines embedded in grooves in the non-wear surface, and cut short of the terminal edges of the block, could be used interchangeably, and thus were the equivalent of one another. A block manufacturer would probably use the cheapest of the available alternatives which will serve the intended purpose.

46. In regard to wire splines, the prior art patents specifically taught that the size of the wire, and the material of the tie, could be varied for the purpose of giving any desired degree of flexibility, this general premise being taught in the patents to Kraft No. 2,266,-464, issued March 16, 1941 (Pl.Ex. 7 HH), Ranta No. 2,823,712, issued February 18, 1958 (filed February 28, 1955) (Pl.Ex. 7 PP), and Newton No. 1,902,-712, issued March 21, 1933 (Pl.Ex 7 T).

Newton specifically stated:

The character of the wire can be made to determine the degree of flexibility in the final strip. For instance, if malleable wire is used, there will be great flexibility and if a hard Bessemer wire is used, the strips will be relatively thick. Or the diameters may be varied. Thus, the degree of flexibility may be better varied by the use of metal wire. However, it is to be noticed that the round cross-section of the wire may be used, without making the key and spline pieces of metal. For instance, they may be made of fiber, or the like. (Newton Patent PX–7T, page 3, right column, lines 95–107, inclusive.)

47. Considering the equivalency of wire spline and splines of other shapes, it is plain that the prior art had long taught and made obvious to a person skilled in the art that it was simply a matter of choice, dictated solely by economic and spacial availability factors, whether a given type of spline was to be installed in grooves in the non-wear surface, or grooves in the edge of the block. This is demonstrated in connection with various wire type splines in Kraft No. 2,266,464, issued March 16, 1941 (Pl.Ex. 7 HH), the French patent No. 1,026,897, Délivré February 4, 1953, and with a comparison of Newton 1,902,712, issued March 21, 1933 (Pl.Ex. 7 T) with Allen 1,796,880, issued March 17, 1931 (Pl.Ex. 7 N). It is also demonstrated with splines made from sheet metal formed as elongated staples by a comparison of Redin, issued December 4, 1951 (Def.Ex. 12) with the patent to Pfiester, issued June 25, 1929 (Pl.Ex. 7 M).

48. Prior to any of the dates of significance in this litigation, it was well understood in the art that while a single metal spline disposed in a groove in the non-wear surface of the block would suffice on blocks up to 9″ x 9″ x 25/32″, in some of the larger blocks it was desirable to use two parallel splines rather than just one. In the case of blocks made from square edge slats, it was obvious that the slats would wobble in parallel planes if only joined by one spline. Accordingly two splines were required when working with this type of slat.

49. Prior to any of the dates of significance in this litigation the art was aware of the general principle that the engagement between a foreshortened spline and the respective slats, and particularly between such a spline and the terminal slats, could be enhanced by either the formation of teeth of that surface of the spline that is to be embedded in the bottom of the transverse groove, as shown in Allen Patent No. 1,808,623, or by purposely deforming the ends of a spline in such a way that they bite down into the bottom of the transverse groove of the terminal slats at points short of the slat's outside edges so that the spline forms, in effect, an elongated staple which imparts an improvement in the longitudinal strength of the block, as shown in Redin Patent No. 2,577,630, issued December 4, 1951.

49A. Starting in 1948 Bradley Lumber Company began manufacture of blocks having the clinched "V" spline construction just described with a Redin machine which could produce blocks having an over-all size of from 6¾″ square to 12″ square from slats ranging in thickness from about ½″ to 13/16″. In this machine the clinched metal of the spline extended into the wood at the bottom of the transverse groove approximately .060″ to form the above-mentioned elongated staple as shown in the cross-sectional profile presented in Def.Ex. 32.

49B. The above finding is based on a stipulation that Mr. Redin, who has no interest in this litigation, would so testify. Plaintiff was apprised of defendant's intention to establish these facts over six weeks prior to trial, and had ample opportunity to make all required investigations prior to entering into the stipulation regarding Mr. Redin's testimony. Plaintiff did not impeach, or attempt to impeach Mr. Redin, or challenge his credibility, or contradict it in any way. The Court accordingly accepts that stipulated testimony as being in all respects true and correct.

50. More than a year prior to any of the dates of significance in this litigation, Tibbals Flooring had utilized a modified version of the assembly machine of the red patent to engage in the commercial production of parquet flooring blocks by a method which included the steps of:

(1) An assembly of a line of elongated wooden slats;

(2) Cutting a transverse groove in one surface of each slat spaced from the ends of each of the slats;

(3) Feeding into those grooves a V-shaped metal spline;

(4) Severing the spline from the supply of spline material within the groove at a point intermediate to the edges of a terminal slat of the group of slats being formed into a block; and

(5) Embedding the spline into the wood defining the transverse groove.

Step 2 above was not performed on the red patent machine, the grooving being done by other machinery in the plant. No particular significance may be attached to that fact because Allen 1,796,-880 pointed out in 1931 that the cut in the back of slats could be made "before or after assembling the strips" (lines 44–46, page 1, P. X 7 N). It is obvious that a cut after assembly would be a preferable choice to one made before assembly.

51. Considering the equivalency of wire spline and V-shaped spline, and the respective techniques for installing them, the above mentioned public use by Tibbals Flooring must be recognized as the equivalent of the public use of a technique including the steps of:

(1) Grooving of the slats;

(2) Feeding into the grooves a wire having an effective diameter slightly larger than the width of the transverse grooves; and

(3) Severing the wire intermediate the edges of a terminal slat of the group of slats.

51 A. In the late 1920's the E. L. Bruce Company, in the course of its manufacture of the ⅜" wire bound blocks described in the opening of Defendant's Proposed Finding 42, utilized a hand-operated block assembly apparatus in a technique which included the steps of:

(1) Grouping of the slats;

(2) Grooving of the slats;

(3) Forcing into the grooves a wire having an effective diameter slightly larger than the width of the transverse grooves; and

(4) Severing the wire intermediate the edges of a terminal slat of the group of slats.

51 B. Finding 51A is based on the stipulation of the testimony of Mr. Frank Lyons mentioned in Defendant's Finding 42A. The considerations there stated are applicable here.

51 C. In the device used by Tibbals Flooring as described in Defendant's Proposed Finding 50, the knife which cuts the spline as it rests upon the wood constituting the bottom of the transverse groove of a terminal slat serves to cause a localized bending of the cut end of the spline into the wood for a distance of approximately .050". This clinching is an inherent result of cutting a piece of steel backed on a piece of wood, as the steel is, of course, considerably harder than the wood. While this clinching of the spline into the wood may be said to form an elongated "half staple," this "half staple" has no purpose as such and is, indeed, partially pulled out in the subsequent stretching operation employed by Tibbals Flooring that will be described in detail hereinafter.

52. The art has long known that in the case of blocks bound together by retaining elements on their edges, backs, or in grooves in the backs, a distinct advantage in terms of dependability in service could be obtained if the respective slats are so spaced from one another as to allow room for hygroscopic expansion normal (perpendicular) to the grain which will occur when the block is placed in an area where it will absorb moisture and swell, e. g., an area having a significantly higher relative humidity than that prevailing at the locale where the block was assembled and manufactured, the

specific amount of spacing required being determined by whether the slats were predominantly plane sawn or predominantly quarter sawn * (quarter sawn slats characteristically experience less hygroscopic expansion when experiencing a given increase in moisture content) and the width of the respective slats. Obviously, a block made up of slats two inches wide requires twice as much spacing between the respective slats as a block made up of slats one inch wide if they are both to accommodate the same increase in moisture content and the relative increase in width due to hygroscopic expansion. By way of example, it had long been recognized that 9″ square blocks, composed of predominantly plane sawn oak, must have a total of 5/64 (0.078) inches of spacing, or 0.026 inches between each slat in the case of a 4-slat block (i. e., 3 spaces) or about 0.016 inches of spacing between each slat in the case of a 6-slat block (i. e., 5 spaces), or stated otherwise, .0087″ of space per inch of block (Tr. 760). If the same block were made of predominantly quarter sawn, but otherwise identical, oak slats, the amount of spacing required would be significantly less because, as just noted, quarter sawn lumber has a smaller factor of hygroscopic expansion.

52 A. A slat experiencing hygroscopic expansion expands from its center outwardly. Thus, when a group of slats which are bound together with a wire-type (or any other type) spline and are each spaced apart a sufficient distance to accommodate hygroscopic expansion, the centers of the slats do not move relative to one another, or to the spline, when the slats are experiencing hygroscopic expansion. All that happens is that the respective edge-faces of the slats move closer to one another. But if the spacing between those edge-faces does not equal the sum of the distances that each of the two opposed edge-faces move, then the slats will (1) abut one another, and then (2) each tries to shove the other out of the way. In the prior art, the likelihood of such shoving was foreclosed by the simple expedient of insuring that the slats were spaced far enough apart so that this would not happen.

53. The amount of significant hygroscopic expansion in a given block is substantially independent of its thickness. In actuality, when the humidity, and hence the moisture content of a block changes, it experiences a change in its lateral dimension, but as a practical matter, all this does is make a minuscule difference in the floor surface-to-ceiling height, which is, of course, undetectable to the occupant of the room in question. Thus hygroscopic expansion in this direction can be, and is, ignored. Wood does not experience here significant hygroscopic expansion in a direction parallel to the grain.

54. Prior to any of the developments which figure in this litigation, the art recognized two specifically different techniques for obtaining spacing between slats bound together by a metal retaining element disposed in a transverse groove in the non-wear surface of a block. In one technique the retaining element is installed in the groove while the ends of the transverse grooves of the respective slats are spaced apart the distance which the entire slats are to be spaced in the finished product. According to this technique, there is never any relative movement between the slats as a whole and the retaining element after the latter has been installed. In the second technique the slats are held firmly together, the retaining element is installed, and the block is then forced through a stretching operation which causes each slat to slip along the retaining element to a position where it has the desired spacing from its neighbors. Either technique can be used with equal ease with either a V-shaped spline or with a wire spline. The details of the

---

* In a plane sawn board, the "rings" extend parallel to the long dimension of the cross section of the boards, or at less than a 45° angle to that dimension. In a "quarter sawn" board, the "rings" run parallel to the short dimension, or at less than a 45° angle to that dimension.

two techniques, and the fundamental difference between them, can be quickly grasped from a comparison of the Bruce Patent No. 2,113,076, dated April 5, 1938 (Pl.Ex. 7 CC) with Tibbals Patent No. 2,650,627, dated September 1, 1953, which is, incidentally, the Red patent that was originally invoked by the plaintiff, but is no longer in suit.

55. Bruce Patent No. 2,113,076 teaches the obtention of what he calls hairline cracks, which he defines as cracks of from 1/64" to 1/32" (0.015" to 0.031") by collecting a group of slats having the transverse grooves already cut in the non-wear surface, assembling the group in abutting relation with their wear surface on a platen having a convex surface which has its radius of curvature extending normal to the length of the slats, and then installing the retaining element *while the slats are maintained in that posture.* As slats, so positioned, will, by definition, have a spacing between their respective non-wear surface edges, and will have a somewhat lesser spacing between the ends of the respective transverse grooves in the respective slats (the amount of these spacings being a function of the thickness of the slats, the depth of the groove, and the radius of the curvature of the convex surface) the result is that when the block bound together by the retaining element is removed from the convex surface, and placed upon a flat surface, *all portions* of the neighboring edges of the respective slats will then be spaced apart a distance which is equal to the spacing that existed between the ends of the respective transverse grooves when the block was residing on the convex platen. Assuming that the spline is installed with sufficiently tight engagement with the respective slats, there is never any change of relative position between the slats and the spline up to, and including, the time when the block is finally installed as a part of a finished floor.

56. The Bruce patent technique for obtaining hairline cracks between the slats of assembled blocks has been regularly employed since the '30s by the E. L. Bruce Company, Inc., in the manufacture of blocks with a variant of a block assembly machine shown in Rhinevault Patent No. 1,859,633, dated May 24, 1932 (Pl.Ex. 7 R). The Bruce Company versions of the Rhinevault machine are slightly different from that shown in the Rhinevault patent in that they replace the flat platen under the spline-flattening plunger 33 with the curved platen of the Bruce patent, and, further, in that the arrangement for severing the length of spine being inserted in the transverse groove of an assembled group of slats from the supply of spline material is like that shown in Figures 13, 24, and 25 of Redin Patent No. 2,557,630. Bruce has not, however, employed the Redin patent's clinching feature, which will be discussed in detail hereinafter. These machines have, in the main, been used by Bruce for installing V-shaped splines but they were also used in the installation of a wire spline during the Korean War period and during the 1959 steel strike, as described in previous Finding 42. Generally similar machines, having curved platens, were used by other manufacturers in this period, although so far as the evidence shows, all such usage was in connection with V-shaped splines.

57. While it appears that most of the commercial production using the Bruce curved platen on one of the variants of the Rhinevault machine discussed above was directed to larger blocks made from 25/32" stock, this technique is equally adaptable to any size block, and has been used to some extent on blocks made of 3/8" stock.

58. The block machine of the Tibbals red patent takes a markedly different approach to obtaining spacing. In that machine a column of transversely grooved slats, disposed non-wear side up, is intermittently advanced, by a reciprocating ram, along a flat bed. At one station on this bed a precut spline is installed in the aligned transverse grooves of four neighboring slats to bind them together into a block. On a subsequent thrust of the ram, the completed block is forced off the end of the flat bed and into a

channel which is so curved as to force the block to assume a concave (relative to the wear surface) configuration, i. e., the same posture that is assumed by the block in the above-mentioned Bruce patent at the moment of the installation of its spline. As detailed in the above discussion of the Bruce patent technique, slats so positioned will, by definition, have a spacing between their "non-wear" surface edges, and will have a somewhat lesser spacing between the ends of the respective transverse grooves in the respective slats, the amount of these spacings being a function of the thickness of the slats, the depth of the groove, and the radius of curvature of the convex surface upon which the wear surface resides. However, since in this case the spline has already been installed, this spacing of the slats is necessarily accompanied by a slippage of the spline relative to the slats, the amount of this slippage (and hence the amount of the spacing that is caused) being selectively controllable by adjustment means which can change the radius of curvature of the channel. When the block is discharged from the curved channel of the machine, and placed upon a flat surface, all of the neighboring edges of the respective slats are spaced apart a distance which is equal to the spacing that existed between the ends of the respective transverse grooves when the block was disposed within the curved channel. As the slippage involved was only obtained through the application of relatively large forces, the spline's engagement with the respective slats remains sufficiently tight to hold the slats in their newly-spaced position against the relatively small forces the block encounters in subsequent handling, finishing and packing, and in the handling by the flooring installer.

59. While the Tibbals red patent, like the Bruce patent, specifically illustrates the use of this stretching technique in connection with blocks bound with a V-shaped spline, it was then obvious to one skilled in the art that the technique as such is equally applicable for use with a wire spline.

60. There is nothing in the Tibbals Red patent to suggest that the stretching apparatus of the device, or other features of the machine, are such that it can, or should, only be used in making blocks from slats of any particular size or shape, and thus this patent presents a broad teaching of the use of the post-insertion stretching step in the manufacture on any type of block which includes a spline capable of being caused to slide relative to the slats.

60 A. The commercial version of this machine, as used by Tibbals Flooring, and by the Canadian assignee of the corresponding Canadian patent, was always employed in connection with $\frac{25}{32}''$ block, but could, with suitable adjustment be used with thin stock.

61. Each of the different approaches to obtaining spacing, as exemplified in the Red patent and the Bruce Patent No. 2,113,076, is the antithesis of the other in that the first technique demands relative movement between the spline and the pieces of wood after the block is formed, and the other is carefully designed for the purpose of preventing relative movement between the spline and the pieces of wood after the block is formed. While both techniques were equally compatible with the usage of any of the various straight splines, having relatively smooth surfaces in engagement with the wood of the slats, the post-insertion stretching technique was not compatible with the technique of inserting the spline in such a manner that its ends were intentionally clinched into the wood of the terminal slats for the purpose of forming an elongated staple, and in like manner was not compatible with the use of a spline which was toothed, serrated, barbed, adhesively coated, or otherwise treated or shaped in such a manner as to resist relative movement between the slats and the spline, because in such instances the post-insertion spacing would have defeated the purposes of the clinching, the presence of the teeth, the serrating, the barbing, etc.

61 A. In further regard to spacing, it should be noted that in some of the

prior art apparatus for obtaining spacing the slats advance in an *integrated* column, e. g., the Red patent, or Lindblom (Pl.Ex. 7 VV), and in some they advance in *segregated* groups, each corresponding to a finished block, e. g., Rhinevault or Redin. Even though these techniques were recognized as being specifically different, it was, prior to any of the dates of significance in this litigation, obvious to a person skilled in the art that either of these systems of advancement could be used in the alternative when the slats were to be spaced at the moment of insertion of the spline and also when the post-insertion spacing technique was to be used.

62. While the Red patent states that the purpose of obtaining the hairline cracks is to enable the block to accommodate hygroscopic expansion, this machine's provision of means for adjusting the radius of curvature of the channel, or indeed, to so adjust the channel that it does not present a true curve, i. e., has a varying radius of curvature, makes it possible for the operator to arrange for the production of blocks having a specified transverse (of the grain) dimension, even though the transverse dimension of the slats being employed in a given run vary from that of other slats of other runs. This feature makes it possible for Tibbals Flooring to eliminate the customary squaring operation, and the block that is discharged from this machine can simply be run through a set of milling tools which are set to tongue and groove the end-grain edges of the block to a dimension equal to the above-mentioned predetermined transverse-of-the-grain dimension.

63. Prior to any of the dates of significance in this litigation there were a number of parquet flooring blocks on the market, or shown in the prior art, which did not employ a spline, but rather utilized panels of paper or fabric adhesively secured to the slats to bind them together and retain them in the configuration of a block. In the older versions of this type of block, the paper or fabric was glued to the non-wear surface of the blocks, an arrangement which has the advantage of giving some protection against moisture coming up through the subfloor. In at least one such commercial product, the block was 6 inches square, and composed of a plurality of slats $5/16''$ thick, the slats being slightly spaced from one another by inserts of a paper-like material which was apparently similar to the paper-like material of the panels to which the non-wear surfaces of the slats were glued. These blocks go back at least as far as Elmondorf's Patent 2,123,408 (Pl.Ex. 7 DD) in 1938.

64. At a time prior to any date of any significance here, a product was introduced in Canada under the name Bar Wood, and in the United States under the name Bond Wood, which consisted of square edge blocks, $4\frac{3}{4}''$ square, made up of five square edge slats which were just under one inch wide and $5/16''$ thick. The individual blocks were assembled in the parquet manner, i. e., with the grain of the block running perpendicular to that of its neighboring blocks, into panels 19'' square, the whole panel being bound together by sheets of paper glued with a water soluble glue to the upper or "wear" surface of the wood. In these blocks, which were characteristically composed of predominantly quarter-sawn slats (and hence are less susceptible to hygroscopic expansion than slats made from predominantly plane-sawn lumber), the slats are simply installed in "hand tight" relationship to one another on the glue-bearing paper retaining element. There was no especial effort to space the slats from one another because the problem of spacing was taken care of during the final installation of the blocks. More particularly, immediately after those blocks were embedded in the mastic, the entire floor was thoroughly wetted for the purpose of dissolving the glue which affixes the paper to the wear surface of the slats, so that the paper could then be peeled off. By virtue of this procedure, the respective slats were thoroughly soaked and hence experienced far more hygroscopic expansion than

they would ever experience as a result of high ambient humidity conditions. As the mastic was still quite soft, the blocks easily adjusted themselves to positions accommodating this maximum hygroscopic expansion. When the floor dried, the slats shrank down to the size that they would have in the prevailing ambient humidity condition, leaving hairline cracks which were apparently comparable to those mechanically induced by the various techniques discussed in the previous finding. In any event, it was the Bond Wood concept that these cracks would be large enough to accommodate any anticipated hygroscopic expansion due to high humidity conditions, and such blocks do not swell or buckle.

65. While for many years most of the parquet flooring block has been prefinished, i. e., varnished, etc., at the factory, the Bond Wood block can not, by definition, be prefinished, and it was then sold, and is still sold, at a lower price than other blocks of otherwise comparable quality.

66. In regard to apparatus for assembling groups of slats and binding them together with a retaining element consisting of a panel of fabric which was adhered to one surface of the slats, it was known that the curved platen used to spread the slats could, in the alternate, consist either of a segment of a circle or one portion of a completely circular structure, such as a wheel. The teaching of Lindblom (Pl.Ex. 7 VV) is particularly pertinent.

67. Thus, in summation of Findings 23 through 65, prior to any of the dates of significance in this litigation, it was obvious to a person having ordinary skill in the art of the manufacture of parquet flooring block that:

1. It was simply a matter of choice as to whether such blocks are formed from tongue and groove slats, square edge slats, or slats having other similar, but distinguishable, configurations.

2. It was simply a matter of choice whether the slats selected had a thickness anywhere in the range of between $5/16''$ to $33/32''$.

3. It was simply a matter of choice whether the slats selected had a width in the range of from under one inch to about $2\frac{1}{2}$ inches, and whether the slats had a length to width ration of from 3 to 1, to 7 to 1.

4. It was simply a matter of choice, dictated by the quantum of interest in the block's capacity to accommodate hygroscopic expansion, whether the slats were cut from stock which is predominantly quarter-sawn or predominantly plane-sawn.

5. It was simply a matter of choice whether the slats were jointed by a planar retaining element, such as a panel of paper or fabric, or by a spline chosen from a variety of different specific shapes, including flat, V-shaped, or round, and the type of the spline selected was simply a matter of choice with a wise decision being dictated by a consideration of the size and weight of the block and the price of the stock from which the spline was to be made.

6. It was simply a matter of choice whether the spline selected was installed in grooves in the non-wear surface of the blocks or in grooves cut in the peripheral edges of the block— but in either instance it would have to be so dimensioned and located as to avoid interference with any remilling of the block that might be required, and to avoid interference with the interfitting of the completed block with a neighboring block.

7. It was a matter of choice, dictated in part by the ambient atmospheric conditions of the geographical area wherein the block was to be sold, and also by the specific installation technique that was to be employed, whether the block should be formed with spacing between the slats to accommodate hygroscopic expansion.

8. If spacing was desired, it was a matter of choice whether the spacing was obtained by spacing the slats at the time of the installation of the spline, as by grouping the slats on

a curved platen, or whether the spacing was obtained by stretching a block which was originally constructed by the installation of a spline when the slats were in an abutting relation on a flat surface.

9. If the spacing was to be obtained by spacing the slats at the time the retaining element is being applied, it was a matter of choice whether the curved platen employed was simply a curved surface representing a segment of a circle, or was actually a portion of a circular structure such as a wheel, as the surface of wheels had been previously proposed as providing an ideal type of curved platen for use in the assembly of slats in a spaced relation.

10. It was a matter of choice whether the free end or ends of the spline should be clinched or embedded in the terminal slats of a block to form, in effect, an elongated staple, or half staple, the choice to be made being dictated by an awareness of the fact that this enhancement of grip would be defeated if the post-insertion stretching technique was thereafter employed to obtain spacing between the slats.

11. It was a matter of choice whether the spline should be toothed, roughened, serrated, or barbed to obtain a tighter frictional or biting engagement between the spline and the slat, the choice to be made being dictated by an awareness of the fact that this effect would be defeated if the post-insertion stretching technique was thereafter employed to obtain spacing between the slats.

12. It was a matter of choice whether the spline selected was relatively rigid or relatively flexible, and this choice could be exercised by varying both the material and the size or diameter of the selected spline.

13. It was a matter of choice whether the slats were grouped in segregated groups, or advanced through the spacing process in an integrated column.

14. It was a matter of choice whether a spline being mechanically inserted into the transverse grooves of a group of slats was cut off from the spline supply when the position of the portion of the spline being cut was:

(a) Located at a point just above the transverse groove of a terminal slat, or

(b) Located at a point within the confines of the transverse groove of a terminal slat, or

(c) Flush with the terminal edges of the transverse groove of a terminal slat;

and, in like manner, it was a matter of choice whether these operations were conducted at one edge of the block, in relation to one terminal slat, or at both edges of the block, with relation to both terminal slats, and whether this was done simultaneously or sequentially, although, of course, specific apparatus employable in the exercising of this choice might well be new and unobvious.

We also make the findings proposed by defendant in its proposed findings Nos. 198 to 203, inclusive.

### III.

■ The findings of fact made in part II support our ultimate conclusion of law that the claims in suit in regard to all four patents are invalid as being fully anticipated or as being directed to subject matter which was obvious to a person having ordinary skill in the art. It is therefore unnecessary to make many of the findings proposed by both parties, particularly those that relate to the background of the controversy and the question of whether Mr. Tibbals did or did not derive anything from Mr. Rebick. Whatever he could have derived would have been, under our findings, obvious to a person having ordinary skill in the art.

In anticipation of possible appellate review, we believe it appropriate to make supplementary findings of fact in regard

to the issue of infringement in the event it should be determined that either our findings on the nonobviousness issue are clearly erroneous or that our view of the applicable law is not proper.

According, we accept all findings of fact proposed by defendant, including those contained in its supplemental proposed findings of fact, excepting only 68–85, inclusive, 87, 90, 95–102, inclusive, 108B, 108C, 109, 114, 116A, 118–119, 121, 127, 166, 166A, 166B, 177, ᵗ212, 237A, 239, 242, 244–249, inclusive, and 251–254, inclusive. In order that the record be clear, we expressly refuse to find the facts as proposed by the plaintiff in both its original and supplemental proposals.

## IV.
## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter.

2. The claims in suit of the Blue, Black, Brown and Yellow patents are invalid as being fully anticipated or as being directed to subject matter which was obvious to a person having ordinary skill in the art.

3. We reject at this stage of the proceeding all other conclusions of law proposed by defendant and all of plaintiff's proposed conclusions of law except plaintiff's proposed conclusion 1, relating to the jurisdiction of this Court over the parties and this cause which we have above stated.

## V.

Within fifteen (15) days, defendant shall prepare, serve on plaintiff's counsel and file its suggestion in regard to future proceedings, including but not limited to its suggestions of an appropriate interlocutory judgment that defendant may believe should now be entered at this stage of the case.

Defendant shall prepare, serve and file an appropriate response to plaintiff's suggestions within ten (10) days after receipt of plaintiff's suggestions.

Plaintiff shall prepare, serve, and file an appropriate reply within five (5) days after receipt of plaintiff's response.

The foregoing suggestions may include requests that the Court make further findings of fact and additional conclusions of law that have heretofore been proposed but refused by the Court. If such a request is made, however, the reasons for such requests and the legal necessity for making such findings or conclusions shall be supported by appropriate citation of legal authority. Further argument on the facts is not deemed necessary or appropriate.

It is so ordered.

## SUPPLEMENTAL FINDINGS OF FACT

In furtherance of this Court's order filed November 2, 1966, and upon further consideration of the matter, the Court hereby makes the following additional findings of fact. Most of these findings are identical to the Defendant's proposed findings which were approved by the Court in the opinion filed November 2, 1966. However, a few of the findings have been modified to present better form, or to include references to uncontroverted facts which may serve to clarify other findings. Upon the suggestion of the Defendant, there are four new findings (i. e. Nos. 84A, 85A, 101A and 197H), which are also directed to uncontroverted facts. In the interest of brevity, a number of findings which were proposed by the Defendant and which were previously found by the Court to be acceptable, but which do not appear to be required to support the judgment being entered, have been omitted herein.

### The Yellow Patent Machine

84A. In 1956 Tibbals conceived, and thereafter began to construct, an assembly machine for assembling slats into parquet flooring blocks. For purposes here practical, that machine was identical with the device portrayed in the drawings of the Yellow Patent, particularly Figures 1, 9, 11a, 12–15.

85A. In this machine, which is of the continuous flow variety, a group of slats, consisting not only of the same number of slats that were to be bound

together in the end-product block, but including the *very same* slats that were to be bound together in the end-product block, were aligned wear side up in parallel relation and then sequentially deposited on a constant speed chain conveyor with the individual slats extending transversely of the direction of the movement of the conveyor. The conveyor was fitted with spacing lugs which were so positioned that the slats of each group being transported thereby were ultimately bound together fairly tightly, and each of the groups of slats were *segregated* an inch or two from the group that preceded it and the group that followed it. The course of the conveyor was such that the wear surface of each segregated group of slats was brought to bear against the periphery of a free-wheeling assembly drum and then caused to follow the peripheral path of that drum for approximately 280°. As the chain conveyor held the slats fast against the periphery of the drum (which, being free-wheeling, simply moved with the conveyor and the slats), the longitudinal edges of the wear side of the slats remained in fast abutment, but the longitudinal edges of the non-wear surfaces became spaced from one another, the specific quantum of this spacing being (as in the case of a fixed curved platen, discussed previously) a function of the radius of curvature of the drum and the thickness of the slats in question. During the period the slats of a given *segregated* group were being held in this posture against the assembly drum, an adhesively coated surface of a continuous web of paper was fed to bear against the non-wear surface of the slats and was then adhesively secured thereto by pressure rollers which pressed the paper into the fast engagement with the slats. The paper web, so applied, simply bridged the spaces between the groups of slats, which spaces were formed by the spacing lugs that have already been mentioned. Thereafter, the conveyor led away from the periphery of the assembly drum, and the continuous web of paper, with the segregated groups of slats glued firmly

thereto, was then led away from the assembly drum to a separation station, where a separating knife cut the paper web along a line disposed between the respective groups of slats, and thus physically separated each group of slats from the one that preceded it and the one that followed it. Thereafter the excess paper was trimmed away and the rough block, having its individual slats spaced from one another, could be squared and/or milled with peripheral tongues and grooves in the usual manner. The term "rough" is used because the block was not then in condition for actual laying, even as an unfinished (i. e., not "prefinished") block. As the Yellow patent machine that was constructed in 1956 was intended for use in making blocks which would have a finished thickness of $\frac{5}{16}''$, and would have the spacing recommended in the TECO report, the geometry worked out that the assembly drum was 42 inches in diameter. (Section B–B, Pl.Ex. 71).

86. While, as discussed above (Finding 66), the prior art knew of the use of the periphery of a free-wheeling drum as an arcuate platen for obtaining spacing between slats during the period a retaining element is being applied, such prior usages had all applied this principle to *integrated* columns of parallel slats. All stretching of *segregated* groups of slats had been performed on arcuate platens which did constitute portions of free-wheeling drums. Stated otherwise, the prior art did not show such a use of a free-wheeling drum in the process of installing a retaining element in a group of slats which (a) corresponded to a completed block and (b) was spaced or otherwise segregated from similar groups of slats which preceded it or which followed. As stated in the Yellow patent (column 9, lines 46–49), the segregation of the groups of slats serves to limit the tolerance building to the accumulated variations of the slats comprising a given group. The significance of this "tolerance building" will become apparent upon a consideration of assembly machines which do not incorporate

this feature, and thus this point, while noted here, will be discussed in more detail in a following finding.

### The Rebick-Crothers Design

88. In early 1956, Frank Rebick was an officer of M. Rebick & Sons, Ltd. of Toronto, Canada, a firm which engaged in the manufacture of parquet flooring blocks, and in the wholesale distribution and installation of both the blocks which it manufactured and similar blocks which it purchased from others. In March of that year Mr. Rebick, acting in his own right, entered into an agreement with Crothers Manufacturing Limited, located in suburban Toronto, to develop a block assembly machine in accordance with Mr. Rebick's specification, and Mr. Rebick was thereafter supplied with a series of drawings, dated in May and June of 1956, of such a proposed assembly machine. In the machine shown in these drawings, an integrated column of square edge slats, aligned in parallel relationship with their wear side up, is advanced in a continuous flow operation under a downwardly depending convexly curved platen in such a manner that the longitudinal edges of the non-wear surfaces become spaced from one another. During the period that the slats are moving along in this posture, an adhesively coated surface of a continuous web of paper is led to bear against the non-wear surface of the slats to become adhesively secured thereto. The convexly curved platen which the wear surfaces bear against is not a curved piece of metal, but rather is a segment of a continuous belt which, in the area in question, has its uppermost surface bearing against a convex metal surface which Mr. Rebick characterized as a solid pressure pad. It then extends around the top of the machine, and around appropriate guide rollers, to complete its loop. The paper web is introduced between the non-wear surface of the slats and the upper surface of a segment of another continuous belt, the loop of which encircles a number of pressure rollers which are positioned to bear upwardly against the lowermost surface of the above-mentioned segment of this belt to cause the uppermost surface of the belt segment to press the paper against the slats, and also to press the slats against the arcuate platen defined by the above-mentioned segment of the first-mentioned belt. The slats are fed into the arcuate channel defined by the respective belt segments by a power-driven feed sprocket which is intricately toothed in such a way as to add new slats to the integrated column in a smooth continuous flow. The belts themselves are not power driven, but rather "ride" along with the slats that are passing between them. Just downstream of the curved platen there is located a swinging saw mounted for travel on an arcuate course, which is motivated, through suitable linkages, to swing across the column of slats at the proper time to cut the paper web along the line of the junction of two slats, and to thus separate a group of slats, e. g., constituting a rough 8-slat block, from the remainder of the advancing column of integrated paper-bound slats. The curved platen has a radius of curvature to create a spacing of .007″ in ⁵⁄₁₆″ slats.

88A. The .007″ spacing between the eight individual slats resulted in a total spacing of .049″ spread over the 6-inch block, or .0082″ per running inch of block. Thus the spacing to be obtained was, for all practical purposes, identical with the .0087″ of spacing per running inch of block which had been conventionally employed in the prior art (See Finding 52).

88B. It is significant that while Mr. Rebick was then fully advised that Mr. Tibbals was then planning to obtain spacing between the slats of paper back blocks by laying whole groups of slats, segregated from one another, upon the periphery of an appropriately dimensioned wheel, and to apply the paper backing while the group of slats were in that posture, Rebick did not incorporate the idea of a wheel into the plans for the Rebick-Crothers machine, and did not follow Mr. Tibbals proposal of segregating the slats into identifiable groups

prior to installing the retaining member. Instead, he used what Mr. Tibbals concedes to be an old expedient, i. e. a curved platen and the old expedient of applying the retaining member to an *integrated* column of slats. As will be developed hereinbelow, all of the subsequent block manufacturing machines with which Mr. Rebick was involved continued to employ the *integrated* column concept, and all of the machines devised by Mr. Tibbals followed the Yellow patent machine's procedure of *segregating* the slats into identifiable groups before applying the retaining means. As will also be developed, all of Mr. Tibbals' machines placed those segregated groups upon a curved platen consisting of a free-wheeling drum, and held them, *as a group,* upon that drum while applying the retaining means, whereas none of the Rebick machines ever utilized that concept.

89. The machine illustrated in this plan, hereinafter referred to as the Rebick-Crothers machine, provides a quick illustration of the "tolerance building" referred to in Finding 86. In those plans there are a total of 36 slats between the feed sprocket which introduces an individual slat into the integrated column of slats, and the position of the saw. Inasmuch as conventional slat-making equipment can only control the width of the slats to $\pm.010''$, it follows that if a given "run of slats" are all at one tolerance extreme or the other, the junction between the terminal slat of a block being separated by the saw and the leading slat of the advancing column of slats will be .360″ away from its design position, and that the saw will have to be moved that far if it is to cut at the design position. This .360″ is the result of "tolerance building" which the Yellow patent machine substantially avoids, i. e., since in the Yellow patent machine the 8-slat blocks are segregated, no portion of a block can be over .080″ away from where it should be—there is no "build-up" of error from slats which are not destined to become part of a block under discussion.

*The Rebick-Klein Machine*

91. On Crothers' recommendation Mr. Rebick retained a Mr. Peter Klein, who was then leaving the employ of Crothers, to construct a Rebick-Crothers machine. Mr. Klein gave Mr. Rebick a quotation on building the Rebick-Crothers machine, but before the construction of the machine was actually begun, Mr. Rebick decided that he wanted to replace using a paper backing with the concept of using a wire spline, and on October 9, 1956, engaged Mr. Klein to build a wire machine, the finalized version of this order being set forth in a letter to Mr. Rebick dated November 11, 1956. The change from paper to wire did not represent a major change in the machine's design, insofar as the feeding, and obtention of spacing was concerned, and all that was necessary was to provide kerfing saws for cutting pairs of transverse grooves in the non-wear surface of the square edge $\frac{5}{16}''$ slats, to replace the paper supply equipment with wire insert rolls, and to replace the saw used to segregate a completed rough block from the advancing column of slats with the saw means for cutting through wire. Rebick's original plan was to employ a knurled steel wire with the machine as so modified. As there was no post-insertion stretching contemplated, but rather the slats would be stretched against a platen defined by a belt segment, as discussed in Finding 88, when the wire was being inserted, the concept of using knurled wire was entirely compatible with such a machine However, at some time prior to the end of December 1956, Rebick concluded that there were a number of disadvantages to using steel wire, i. e. the dangers of rusting and the danger of sparks when the wires were sawn, the latter being a matter of not inconsiderable consequence in the sawdust laden atmosphere of a woodworking plant. He also concluded that he did not want the extraordinarily tight grip that would be obtained from a knurled wire, as this would impede the microscopic shifting of the slats due to hygroscopic expansion,

and that it would be better to use an arrangement which would make it easier for the slats to experience that movement. Accordingly, he abandoned the notion of using knurled steel wire and decided to use a smooth aluminum wire, and Mr. Klein proceeded to construct the machine on that basis. This machine will hereinafter be referred to as the Rebick-Klein machine, although from time to time in the record it is referred to as the Canadian patent machine.

92. The Rebick-Klein machine is portrayed in Figure 5 of Rebick's Canadian patent, comprising Pl. Ex. 19A. As this is a method patent rather than an apparatus patent, in accordance with Canadian practice the apparatus is only illustrated schematically, and thus certain details of its operation are not made altogether clear in that drawing. Nonetheless, the quickest insight into the operation of that machine can be obtained from reference to this patent. In actuality, this machine used the same slat spacing arrangement that was proposed in the Rebick-Crothers machine, and the wear surface of the slats was forced upwardly against the under surface of an arcuately curved moving belt which functioned as an arcuate platen, the arcuate curvature of the belt resulting from the fact that its upper surface bore against a curved metal surface. While Figure 5 of the Rebick Canadian patent includes an arrow with a curved shank, which might seem to suggest that the arcuate platen was a portion of a large wheel or drum, the text of the patent does not support this suggestion, and it was not Mr. Rebick's intention to create that suggestion. Rather the curved shank arrow presented just above wire insertion wheel 22 in Figure 5 was intended by Mr. Rebick to connote the curving movement of the belt and the slats being pressed against the belt. It is significant that Mr. Rebick's patent specifically acknowledges that the use of a rounded form to space the slats when a spline is being inserted is "a well-known expedient of the prior art" and "is not a part of this invention" and

does not attempt to obtain a monopoly on that concept. It is equally significant that Mr. Tibbals acknowledges that this concept is "old in the art".

93. The Rebick-Klein machine follows the Rebick-Crothers machine's principle of employing eccentrically mounted sawing means, located at a point downstream from the station where the retaining member is installed, to sever the aluminum wire splines at the juncture of a trailing terminal slat of a group which, when cut away, will comprise a rough block, and the leading slat of the continually advancing integrated column of slats. Stated otherwise, the saws made the cut "on the fly" as the integrated column was advancing.

94. These saws made a cut $\frac{1}{4}''$ (.250'') wide across the bottom of the block in a direction parallel to the slats to sever the wires (Tr. 760–761; Tibbals, 9/16/63, p. 46). Thus, assuming that there was no tolerance building in the slats, and/or assuming that the saw position had been adjusted for the tolerance building prevailing at the time in question, cut the wire almost a full $\frac{1}{8}''$ (.125'') within the confines of each terminal slat. Technically speaking, if one considers the spacing of .007'' between the slats, in such a situation the saw would cut off the wire approximately .122'' within the confines of each terminal slat. Of course, if the saw position was not properly adjusted to match the prevailing tolerance build up, the saw's cutting would be further within the confines of the terminal slat of the block being formed, or of the leading slat of the integrated column of slats, depending upon whether the tolerance building was on the minus side or on the plus side.

*The Blue Patent Machine*

101A. As of December 1956, Tibbals had been unable to get the Yellow patent machine to produce a paper felt backed block. In his own words "we never got that machine to even make a foot of it." At that time Tibbals decided to convert this machine over to a machine which would assemble a wire bound block. By January 20, 1957, Tibbals had prepared

assembly drawings of a modification of the Yellow patent machine which employed the same arrangement for grouping slats and installing them on spaced stations on the periphery of a large wheel, but replace the mechanism for gluing on a paper web with a mechanism to install wires in transverse grooves cut in the non-wear surface of the slats. The actual conversion of the Yellow patent machine was begun shortly thereafter.

103. For purposes here practical, the January 27, 1957, assembly drawing is identical with the drawings of the assembly machine of the Blue patent, and this machine can most easily be described by reference to the drawings of that patent. However, before discussing some of the complex details of that machine, it should be noted at the onset that this machine, like its predecessor the Yellow patent machine, never worked out. In Mr. Tibbals words, "it was simply no good" or "it never did work".

104. In the Blue patent machine the slats were grouped in parallel relationship, wear side up, in *segregated* groups by the same chain conveyor that was used for the grouping step of the Yellow patent machine. As the segregated groups were carried toward the assembly drum, they passed over kerfing saws which cut pairs of transverse grooves on the non-wear surface of the slats. After the wear surfaces of the segregated groups of slats had been brought to bear against the periphery of the assembly drum, in the manner of the Yellow patent, that is to say with the longitudinal edges of the non-wear surfaces being spaced from one another, the segregated groups, with their slats so disposed, passed wire insert stations, where a knurled wire was installed in each of the grooves, and then passed pairs of holding dogs, and pairs of wire cutters, and then passed two pairs of wire seating rolls. Upon leaving the last wire insert rolls, each group, then constituting a rough block having its individual slats spaced from one another, had a knurled wire embedded in each groove, each of the wires extending from a point intermediate the edges of a leading terminal slat to a point intermediate the edges of a trailing terminal slat, the intermediate points being approximately the mid-points of those slats (Figure 12). The stated advantage of such foreshortened wires being that this arrangement prevents any interference by a wire with a subsequent finishing operation, wherein the edges of the rough block are trimmed to size and finished in conventional finishing apparatus.

105. The procedure for inserting and cutting the wire can be most conveniently described by simply treating those procedures in relation to one of the wires, it being understood that the other wire experienced precisely the same treatment at precisely the same time.

Referring to the Blue patent drawings, a bight of smooth wire was led from a supply roll through conventional knurling rolls, where it was roughened. As so roughened, the wire 51 had a diameter slightly greater than the width of the transverse grooves that have been cut in the slat. It then extended, in a straight line, through a sleeve mounted at the end of a reciprocatable piston rod extending from a cylinder, hereinafter being referred to as a "kinking cylinder" 75, from whence it led into a peripheral groove of a roll 59 (Figure 4) mounted in a peripheral tangency with the path of a groove of the passing groups of slats. This peripheral groove is so shaped and dimensioned that the wire disposed thereon is forced upwardly to a position partially within, but not totally within, the grooves of the slats passing the wire. The slats, then carrying the wire partially embedded in their groove, next pass a holding dog 72 (Figure 6), which is spring biased to bear upwardly against the wire, and has a chiselled point 72 whose function is to prevent the wire from pulling backwards, i. e. in a direction opposite to the direction of movement of the slats, except to response to a force greater than the ordinary drag of the wire. It also helps support the wire which is, as noted, but lightly embedded in the mouth of the groove. Just downstream of the chiselled point 72, there is located a rotating sprocket which, through the action of

suitable gears, revolves when the assembly drum revolves. The sprocket has knives 89, mounted to extend radially therefrom, and its rotation is so indexed to that of the assembly drum that, as each group passes by, a knife will come up to position to cut the wire spline at the mid-point of a trailing terminal slat of a passing group of slats. This cutting action can be understood from a consideration of Figure 8 of the patent, once it is understood that, through a draftsman's error, the Figures show the cut being made along the line of the interior edge of a terminal slat rather than at the intended position.

106. At the moment the knife 89 contacts the wire 51 the wire is only partially within the groove, but the action of the knife bearing against this wire forces the same deeper into the groove until it backs up against the bottom of the groove and is there cut. This operation does not serve to seat the entire wire deep into the groove. That is to say, it does not serve to seat the portions of the wire which are spaced from the portions being cut, and it is for this reason that the wire seating rolls 95 and 96, located downstream from the position of a group experiencing the wire cutting operation, illustrated in Figures 9 and 10, are employed to drive in the remainder of the wire and seat it home in the groove.

107. At the moment the wire was cut within the confines of the trailing terminal slat of a group of slats which will, for purposes of discussion, be treated as Group No. 1, Group No. 2 had just passed the wire insert wheel. At that moment, the bight of supply wire had its free end within the confines of the trailing terminal slat of Group No. 1. It bridged the spacing lugs 24 (Figures 14, 15) between Group No. 1 and Group No. 2 and then ran along, and was partially embedded within, the mouth of the groove in Group No. 2, and then bridged the spacing lugs between Group No. 2 and Group No. 3 at which point it extended along a part of the peripheral groove in the wire insert wheel and thence, in a straight line, through the sleeve on the

piston rod of the kinking cylinder, to the knurling wheels. At that moment the chisel point of the spring biased holding dog was pressing upwardly on the wire at a point directly below the leading terminal slat of Group No. 2.

*After* the wire was cut, an element mounted on the sprocket 83 actuated a limit switch which, in turn, actuated the kinking cylinder 75, causing it to expel the piston rod outwardly to an extreme position. When this occurred, the sleeve on the piston carried the wire passing therethrough upwardly, and thus the wire no longer extended in a straight line from the knurling roll to the wire insert wheel. This, of course, created a tension in the wire bight. As the wire could not slide through the knurling wheels, and thus obtain relief from this tension, and as the wire could not stretch, this tension manifested itself by pulling the *free* end of the wire bight rearwardly through a distance sufficient to relieve that tension. The kinking cylinder was so designed and dimensioned that this distance was precisely the distance from the point where the wire was just cut (the midpoint of trailing terminal slat of Group No. 1) to the midpoint of the groove of the leading terminal slat of Group No. 2. The piston rod then retracted to its home position to await the signal for a new cycle.

As the chain conveyor continued to advance, the assembly wheel continued to revolve. Thus Group No. 1 advanced to pass under the wire seating wheels 58, 59, Group No. 2 (with the wire lightly embedded in the mouth of the group) advanced to the position formerly occupied by Group No. 1 over the wire cutter, Group No. 3 advanced to the standby position, etc., at which time the cutting and jerking cycle was repeated.

107A. As the wire bears against the bottom of the groove when it is cut, the cutting action necessarily caused a small amount of deformation of the wire into the wood. However, it was contemplated that the cutting knives should be so positioned, and kept sufficiently sharp, that the wire would not experience any more deformation than the inherent deforma-

tion that would occur when a steel wire is cut against a backing of wood.

108. The Blue patent machine never worked. That is to say, Mr. Tibbals could cajole it into making a few pieces of block before an improvident jerk of the wire kinker pulled a wire out of its intended track, but as a machine designed for commercial production, it simply never worked.

108A. "One of the reasons why the wire jumped from the groove" of Group No. 2 was that the free end of the bight that was jerked rearwardly had its end "bent" as a result of the cutting operation in what has been designated as Group No. 1.

### The Black Patent Machine

110. By the late summer of 1957 Mr. Tibbals had come to recognize that the Blue patent machine would never work satisfactorily and, therefore, devised the block assembly machine of the Black patent. The first assembly drawing of this machine was dated September 1957. As this machine was simply a modification of the Blue patent machine, and more particularly simply a modification of the wire inserting, cutting, and seating mechanisms, the Blue patent machine was cannibalized to make the new machine and the changeover was completed sometime during the fall of 1957.

111. For purposes here practical, this machine is identical to that shown in the Black patent and can be most easily described by reference to the drawings of that patent.

112. In this machine, as in the Blue patent machine, the slats were grouped in parallel relationship, wear side up, in segregated groups by the same chain conveyor that was used for grouping in the Yellow patent machine and the Blue patent machine. As in the Blue patent, the conveyor carried the segregated groups of slats over kerfing saws, which cut pairs of transverse grooves on the non-wear surface of the slats. After the wear surfaces of the segregated group of slats had been brought to bear against the periphery of the assembly drum, in

the manner of the Yellow patent and the Blue patent, that is, with the longitudinal edges of the non-wear surfaces being spaced from one another, the segregated groups, with their slats so disposed, passed a pair of holding dogs, which served to partially insert a wire within the grooves and then passed a wire seating roll having sequentially operating cutters (80a, 80b, 80c and 80d, beginning with 80a at the eleven o'clock position of the roll in cutter assembly 75, 80b being at the four o'clock position, 80c at the five o'clock position, and 80d at the ten o'clock position), which sequentially cut the wire within the confines of the leading and trailing slats, respectively, of neighboring groups. Insofar as successive blocks are concerned the wire is sequentially cut in the leading slat of the first block by knife 80a, and the wire in the trailing slat thereof by knife 80b. In a neighboring block the wire is cut in the leading and trailing slats by knives 80c and 80d, respectively. The groups then passed pairs of insert rolls, which seated all portions of the wires that had not been previously seated, and finally, passed pairs of wire remnant removers which removed the wire remnants that bridged the space between the segregated groups. Upon leaving the wire remnant remover, each group, then constituting a rough block, having its individual slats spaced from one another, was removed from the assembly machine by the chain conveyor.

113. In the Black patent machine each of the knives which sequentially sever a wire in the respective terminal slats is purposely blunted to such an extent that the wire is not only cut, but is clinched downwardly (strictly speaking, upwardly) into the wood comprising the bottom of the transverse groove of the terminal slat. As such cutting and clinching occurs in both terminal slats of each segregated group of slats, the end result is that the wire spline may be said to form an elongated staple having its legs projected into the wood underlying the groove of each of the terminal slats.

As in the Blue patent machine, it was contemplated that each free end of the

wire would be located a sufficient distance within the confines of its respective terminal slat so as to prevent any interference of the steel wire with a subsequent finishing operation wherein the edges of the block are trimmed to size and finished in conventional finishing apparatus. While this is a matter of little importance if the wire is made of aluminum, because wood milling knives will cut through aluminum quite effortlessly, if the wire splines are made of steel, any contact between the milling knives and the spline would quickly result in the knives being dulled and ruined.

113B. In the commercial use of the Black patent machine, the legs of the elongated staple, i. e. the clinch, extend into the wood a distance of at least .050″.

### The Tibbals Block

115. The first commercial production of the block which is the product of the machine of the Black patent, was in the form of a ⁵⁄₁₆″, 6″ x 6″, unfinished block which is categorized as a square edge block, but which, in actuality, had its peripheral edges so milled, at the time the rough block was squared, as to have the edges bevelled downwardly and inwardly approximately ¹⁄₁₆″, to facilitate any required minute shifting of the block in the soft mastic when it was being laid. In view of the fact that the squaring and bevelling operations take away some of the wood from the edge, the clinched end of the wire in such blocks, in their commercial form, was somewhat closer to the free edge of the block than it was at the time the block was discharged from the machine of the Black patent. Starting in September of 1958, Tibbals Flooring converted its production from the unfinished "square edge" block to a pre-finished block having tongues on the edge-grain edges of the block, and having the other two edges correspondingly grooved. While the Tibbals square edge block could adjust itself to conform to minor variations in the sub-floor, and then could have its wear surface sanded to a smooth planar configuration in the subsequent *in situ* finishing operation, due to the tongue and groove relationship between the Tibbals pre-finished blocks, it is not possible for those blocks to so adjust themselves to minor variations in the sub-floor.

116. The wire employed in all of the thin blocks produced by Tibbals Flooring with the Black patent machine is annealed steel wire, having an original diameter of 18-gauge (.047″) but having an effective diameter of .055″ as a result of the knurling operation. The individual slats are spaced from one another at precisely the same distance. Up to the time of trial Mr. Tibbals treated the precise spacing imparted to the slats as a trade secret, and the size of the assembly drum employed as a trade secret.

### Further Activity By Rebick

117. On October 15, 1957, Mr. Rebick filed an application for a Canadian patent on the Rebick-Klein machine, and the tile made thereby. While the nature and scope of the patent protection obtained by Mr. Rebick in Canada is irrelevant here, it is significant that in this application, which matured into Canadian Patent No. 573,892, issued April 14, 1959 (Pl.Ex. 19A), he emphasized that the Rebick-Klein machine was intended to make a block with a wire spline so installed that the respective slats *could experience a limited movement* along the wire in response to hygroscopic expansion and contraction (column 1, lines 27–36). This broad concept presents a vivid contrast with the stated concept of the Black and Brown patents to employ both knurling on the wire and clinching on the wire to *prevent movement* of the precisely spaced slats relative to the wire, once the wire has been installed. A few days later, Rebick applied for a United States patent on the Rebick-Klein machine, but this application was eventually abandoned. (Pl.Ex. 19).

120. Sometime thereafter Rebick designed the new wire block producing machine, which is the subject of British Patent No. 910,376, dated November 14, 1962, which issued on an application filed April 20, 1960. This machine was referred to in the testimony as the British

patent machine, and will be so referred to in these Findings.

122. Mr. Rebick and his associates organized the Avis Machinery Company, Ltd. for the purpose of constructing British patent machines, and the first such machine was completed in early 1959. Later, four other machines of the same general type were constructed by Avis, three of these for the use of J. J. Hartvale, Ltd., another company associated with M. Rebick & Sons in the production of thin parquet block flooring at their Toronto plant and, a little later, two more for use by the Pat-N-Wood Corporation, a Pennsylvania corporation, which had been set up by Mr. Rebick and his associates to conduct certain operations at Oil City, Pennsylvania, including particularly the manufacture of thin parquet flooring block with the above-mentioned machines and, further, the manufacture of lumber for slats to be used both by those machines and by the earlier versions of those machines being operated by M. Rebick & Sons in Toronto.

123. As the machines directly involved in this litigation are simply modifications of the British patent machines, and as the accused machines will be described in a good deal of detail in the next group of findings, it will be simpler to defer describing those machines for the moment, and to later succinctly describe them in terms of their specific differences from the accused machines.

124. In March of 1962 Cloud Oak I entered into a three-way preliminary agreement with Mr. Rebick and Pat-N-Wood Corporation, which preliminary agreement was later encompassed within a more formalized agreement of April 23, 1962, whereunder Cloud (1) obtained a license from Frank Rebick under his pending United States patent application corresponding to the British patent, (2) purchased the two block assembly machines which center in this litigation from Pat-N-Wood Corporation, and (3) loaned Pat-N-Wood a sum of money, at least some of which was directed to removing encumbrances upon the machinery, the arrangement being that Cloud Oak I would first apply the royalty payments under the Rebick patent application to the retirement of Pat-N-Wood's debt to Cloud Oak I, and, after that debt was paid, all further royalties would be paid over to Mr. Rebick unless he and Pat-N-Wood had, in the meantime, incurred new liabilities to Cloud under a "hold harmless" clause which related to their duties and obligations in the event that the machines became involved in a patent infringement controversy. The license under the pending patent application gave Cloud Oak (I) an exclusive right, (except for Pat-N-Wood), to use the assembly machines and to sell the product thereof in one specified part of the United States, and a non-exclusive right to conduct such activities in the remainder of the United States.

125. It might be noted here that as of the time of trial, the royalty payments accrued had not retired the Pat-N-Wood debt, and on the basis of present rates of production it would appear that this debt would not be retired for a decade or more. Thus as things now stand, Rebick's obligation to hold Cloud Oak (I) (or its successor) harmless is an asset which is more theoretical than real, because at the moment Mr. Rebick has no assets, and had not made any financial contribution toward the defense of this lawsuit. Indeed, his present situation is such that the Defendants even had to pay his transportation expenses for pre-trial meetings and for his appearance at the trial. In this respect, it should have been noted that Cloud Oak (I) made the decision to contest the patents in suit and that Mr. Rebick had no vote in that decision, although this is not to say that he did not acquiesce in that decision. There seems to be a feeling that the agreements leave room for disagreement as to whether Mr. Rebick and Pat-N-Wood are, under the circumstances, bound to pay Cloud's litigation expenses, as distinguished from compensating Cloud to the extent of any adverse judgment on patent infringement. There is no need for this Court to determine that question in this case and, indeed, the present record does

not provide sufficient evidence on the intention of the parties, and on any subsequent understandings reached, to make such a determination.

126. The Rebick United States patent application, corresponding to the British application, has not matured into a patent.

### The Accused Cloud Machines

128. An understanding of the Cloud machine can be quickly obtained by a reference to Pl.Ex. 12B-I and Pl.Ex. 18, and the mode of using that assembly machine in a complete operation for manufacturing a finished block can be had by reference to Def.Ex. 34. As will be better understood after considering the finding which follows, Pl.Ex. 12A gives an incorrect impression about the operation of the assembly machine in that it suggests that the wire splines are customarily cut at a point within the confines of a terminal slat of a block which is being formed. In this respect that drawing fails to fairly represent either the intention and purpose of the assembly machine, and in like manner fails to fairly represent its normal mode of operation.

129. In accordance with a pretrial agreement, Pl.Ex. 12B-I and 18 were prepared at the Cloud plant by competent draftsmen under the general supervision of counsel for the Plaintiff, but with counsel for the Defendant being present for the entire period. There are only a few inaccuracies in these drawings which are of significance. First, in the captions the word "knurl" is technically misapplied. Second, in Pl.Ex. 12E the spacing between the top of a slat and the guard rail is shown as being about three times as large as it actually is. On the machine this space only measured .033" and thus this distance should only be approximately 1/10 of the thickness of the slat which is shown as residing under the guard rail. Third, the spacing skid or roll, as the case may be, in Pl.Ex. 12H and 18 are portrayed as being lower than they usually are in regular production (Tr. 888).

129A. One further error in Plaintiffs' Exhibits 12B-I, and Plaintiffs' Exhibit 18 is that the skid shown in Plaintiffs' Exhibit 12H and the stretching wheel shown in Plaintiffs' Exhibit 18 are both portrayed in a lower position than is normally used in the Cloud operation. In normal operations, the peripheries of the arcuate surfaces extend above the bed of the machine .200". Stated otherwise, they extend above the bed of the machine about four times as far as is illustrated in Plaintiffs' Exhibits 12H and 18.

130. The Cloud block assembly machine consists essentially of an elongated flat bed, having a series of stations at which points specific parts of the block assembly operation are performed. An *integrated* column of slats, aligned in parallel relation, with their non-wear sides up, is intermittently advanced along this bed by action of a reciprocating slat-pushing ram which, when it is in its retracted position, leaves a space for the receipt of a supply of fresh slats which are delivered to a proper position at the head of the integrated column by a cross-feed ram. As the slats intermittently advance along the bed, they first encounter kerfing saws which cut transversely extending grooves along lines approximately 1¼" from the respective ends of the slats, then pass a wire insertion station where smooth aluminum wire, .051" in diameter, is inserted into each groove. The slats, then are bound together by the wires, next proceed to a wire cutting station, where they pass under a pair of depending knives, which are arranged to plunge downwardly, and cut the respective wires at the edge of every 7th slat, and to thus separate a group of 7 slats, which will then constitute a rough block, from the advancing *integrated* column of slats. The next advance of the slat-pushing ram moves the block past edging saws which trim the edge-grain sides of the block, and a subsequent advance of the ram drives the block through an arcuate path which serves as a post-insertion stretching station, the arcuate path being defined by a pair of arcuate platens extending through the bed of the machine and a pair of flexible strips extending over the platen. Passage through this

stretching station serves to space the respective slats from one another, although not necessarily in equal amounts.

131. A subsequent advance of the slat-pushing ram pushes the stretched block to the end of the bed, from whence it is manually removed and placed in a hopper which feeds a conveyor system which carries a rough block through sanders, which alternately sand both sides of the block, and which then carries the blocks past tongue-cutting saws, which cut tongues in the edge-grain sides of the block, and then carries the block past grooving saws, which cut grooves in the edges of the block which extend parallel to the grain of the slats, i. e. parallel to the length of the respective slats. The block is then "pre-finished" with suitable varnishes, waxes, etc, by processes with which we are not concerned here, and is then ready for shipment.

132. As the present controversy centers on the supplying of slats by the cross-feed ram, the wire insertion operation, the wire cutting operation, and the stretching operation, and each of these operations will now be discussed in some detail.

133. The operation of the cross-feed ram is best shown in Pl.Ex. 12B and 12I. A slat-feed belt conveyor, extending parallel to, but located at one side of, the assembly machine bed, delivers an integrated column of slats, arranged in parallel alignment with their non-wear sides up, to a position where the leading slat abuts against a stop which extends along a line representing the approximate midpoint of the throw of the slat-pushing ram. During the portion of the assembly machine cycle wherein the slat-pushing ram is in its fully retracted position, a cross-feed ram, arranged to reciprocate in a direction perpendicular to the throw of the slat-pushing ram, pushes the seven leading slats of the integrated column of the slat-feed conveyor into the void on the assembly machine bed which was left by the retraction of the slat-pushing ram. After this has been done, the seven slats in question are aligned in parallel relation

with each other, and with the slats of the integrated column which is already disposed upon the bed of the assembly machine, but the leading slat of this group of seven slats is slightly to the rear of the trailing edge of the last slat of that integrated column. On the next cycle of the machine the slat-pushing ram first advances a distance to push the group of seven slats forward until they contact, and become integrated with, the integrated column of slats. Continued further movement of the slat-pushing ram, through a distance equal to the design width of seven slats, then serves to advance the entire integrated column that distance. The slat-pushing ram then reciprocates back to a position allowing clearance for the cross-feed ram to supply another group of seven slats for a similar advancement by the slat-pushing ram in the next cycle of operation.

134. The Defendants attach a special significance to the fact that the slats of the group of seven slats, which is transferred by the cross-feed ram, and immediately thereafter *integrated* into the column of slats on the bed of the machine (and thus lose their identity as a group), do not end up in the same rough block which is thereafter formed by the action of the cutting assembly. The Plaintiff, on the other hand, places special significance on the conceded fact that it would be relatively easy to so modify the machine that this group of seven slats would, after being integrated into the column of slats on the bed of the machine, eventually end up in the same rough block.

135. Referring to Pl.Ex. 12D and 12E, at the wire insert station each slat passes under a pair of free-wheeling wire insertion wheels, each of which serves to insert and seat a .051″ aluminum wire into the respective transverse grooves, which have a width of approximately .044″ and a depth of approximately .075″. For simplicity of discussion, only one wire will be considered. As the insertion wheel can, by definition, only have a thickness which is less than the width of the groove, it is necessary to

employ some sort of guide means to hold the wire in tangential alignment with the periphery of the wheel as the wire is fed into the slat groove. This office is performed by a wire guide assembly, which is so formed that it presents an arcuate groove to the periphery of the quadrant of the insertion wheel that is about to enter the groove in the slat and which, together with that portion of the periphery of the insertion wheel, defines a closed arcuate channel for the wire which will hold it in its properly aligned position.

136. As will be evident, if the wire is broken, or when one supply spool of wire is exhausted, a bight of wire must be threaded through the channel, and into the slat groove, before operations can be resumed. In practice, this tends to be an irritating and time-consuming task. Accordingly, the periphery of the wire insertion wheel is serrated, in any of a variety of patterns, so that it will grip the wire during such rethreading operations, and thereby expedite this entire procedure. Once the wire is in position, and the machine is operating, the serrations on the wheel perform no purposeful office. However, as the aluminum wire is, of course, considerably softer than the hard steel of the wire insertion wheel, and as the wire insertion wheel is so positioned as to firmly press down on the wire to seat it in the bottom of the groove, the insertion wheel leaves a visible serration on the surface of the wire which faces the mouth of the groove, i. e. along a straight line extending along the uppermost surface of the wire.

137. But the very nature of the way these serrations are created, that is to say when the wire is already in frictional engagement with the bottom and lower walls of the groove, the arc of the wire that is serrated, which includes about ⅛ of its periphery, is not in contact with the wood of the slat, and these serrations never contact the wood thereafter. Thus, they do not have any effect of any kind on the degree of engagement between the wire and the slat.

137A. These serrations are so shallow that they do not affect the round cross-sectional configuration of the wire to any noticeable degree. They certainly do not in any way suggest, much less approach, the periodic flattening which Rebick disclosed as one of the alternate techniques of his Canadian patent 637,-100. While the wire-insertion wheel does bear down on the wire with a considerable amount of force, there is nothing to suggest that this force is ever great enough to in any way "mash" any part of the wire.

138. As the wire insertion wheels push down on the wire with a considerable amount of force, and as the wire is then bottomed in the groove, the wood under the wire insertion wheel would, during the course of a period of months, cause the bed of the machine to wear at the points directly under the bottom dead-center of the wire insertion wheels, were it not for the presence of pressure relief rollers which are mounted under the bed of the machine and have a small portion of their periphery extending through holes cut in the bed. The expression "small portion" must be taken quite literally. Due to the presence of guard rails on the edges of the bed, which have portions extending over the ends of the slats, the 3-inch pressure relief rollers cannot be elevated higher than a position wherein the cord of the periphery, which extends above the bed of the machine, has a height of .033" without causing the slats to jam. In actual practice, the pressure relief wheels are, of course, maintained in a slightly lower position.

138A. More particularly, in day to day operations the pressure relief rollers are maintained in a position wherein they are substantially flush with the bed of the machine.

138B. At the beginning of the trial the Plaintiff asserted that it would establish that the pressure relief rollers under the wire insertion wheel of the Cloud machine "is or may be made to rise above the level of the bed to impart

224

spacing to the slats along the wire being inserted to form the block". However, in tests conducted at the Defendant's plant, it was found that raising the pressure relief rollers to the highest position to which they could be raised without jamming the machine, i.e., to a height where their highest point extended above the bed of the machine a distance slightly less than .033″, did not serve to create a detectable amount of spacing between the slats, this test having been conducted with the spacing device at the end of the bed being lowered to an inoperative position.

138C. While the Plaintiff required Mr. Cloud and Mr. Rebick to give their best guess as to whether modifying the machine in such a way that the 3-inch pressure relief rollers could be raised to a higher position, and by the addition of some means to press the slats against that wheel, would result in the imparting of spacing in slats at that point, the fact remains that neither of these witnesses had ever made these modifications in the machine. Accordingly, while their opinion that the wheel would be too small to give the desired quantum of spacing would certainly seem to be well founded in mathematical logic, the record must, nonetheless, be regarded as inconclusive on this point, and thus the Court is unable to make a definitive Finding as to precisely what would happen if the machine were subjected to those structural modifications.

138D. The differences between the intention, purpose and function of the 3-inch pressure relief rollers in the Cloud machine and the 40-odd inch wheels of the Yellow, Black and Blue patent machines are dramatized by the fact that the removal of the pressure relief roller will not in any way affect the operation of the Cloud machine, but rather will merely cause a gradual localized wear of the bed in the area directly under the wire insertion wheels, whereas removal of the above-mentioned wheels from the Yellow patent, Blue patent, and Black patent machines would, of course, render each of those apparatus completely inoperative.

138E. The wire insertion wheels are vertically adjustable. They are raised to enlarge the arcuate channel when a new wire is being threaded into the machine (as, for example, when the wire has been broken or one spool of wire has been used up), but are then lowered to bear down on the wire, and hence to seat the wire firmly in the bottom of the transverse groove, when the machine is being operated in the regular manner. As the wire is larger than the transverse groove, when a new wire is being threaded into the machine it can only be advanced through the above-mentioned arcuate channel to a point where its bottom end encounters the mouth of the groove. The lowering of the wire insert wheels causes the serrations on the periphery of the wire insert wheel to "grab" the soft aluminum wire. That same lowering of the wheel brings the other wire insert wheel into fast contact with the wire in the other groove so that advancement of the slats, through action of the slat pushing ram, causes the other wire to advance, and this exerts a tangential force on that other wire insert wheel which causes it to turn, and hence causes the first wire insert wheel to turn so as to carry the bight of wire into the transverse groove. If the serrations were not present, it is evident that the wire insertion wheels would not "grab" the wires as well, and it is thus evident that the serrations do make it considerably easier to effect the rethreading operation.

138F. The wire insertion wheels bear straight downwardly on the wire and press the same fast against the bottoms of the transverse groove. As the wheels are journaled for free rotation, the only force which they are capable of exerting is a vertical force in a downwardly direction. They are inherently incapable of exerting any forces in a horizontal plane and are inherently incapable of exerting a force on the slats passing thereunder which would force the wear

surface longitudinal edges of the slats (i.e. the edges which are in contact with the pressure relief rollers) into abutment with each other.

138G. At no time does any group of slats, corresponding in either number of slats or in identity of slats with a completed rough block, ever contact the pressure relief roller. More particularly, in view of its small size, and the fact that its periphery is maintained flush with, or substantially flush with, the bed of the machine, there is never an occasion when more than two slats are in any contact with the pressure relief roller.

138H. As the wire guide assembly is merely a passive agency which serves as a guide, but does not itself serve to advance the wire to the slats, or to install the wire in a position wherein it begins to act as a retaining element, it is not accurate to describe the wire guide assembly as a "means for applying a common retaining element" to the slats.

139. Referring to Pl. Ex. 12G, after a slat has had the wires inserted in its groove, it next advances to a wire cutting station where two knives are mounted on a movable carrier which is, by means of linkages not necessary to describe here, arranged to lower the knives to sever the wire along the junction of every seventh and eighth slat that passes thereunder. Each of these knives have cutting blades approximately 3/8″ long and are so disposed that the length of the blade extends at an angle of 45° to the line defined by the wire which it serves. Thus it is a matter of elemental geometry that if the portion of the knife contacts the uppermost portion of the wire at a point precisely along the junction of the two neighboring slats, some portions of the cut that is made will be .025″ within the confines of one slat, and the opposite extreme portions of the cut will be .025″ within the confines of the other slats. On the other hand, considering the nature of a horizontal cut through a round-in-cross-section element, the final severance of the wire will occur on the line of the junction. The total maximum length of the cut itself, i. e. halfway down the wire, will be .070″.

140. As there are a total of 29 slats between the point of forwardmost throw of the slat-pushing ram and the design location of the cutting knives, and as, as has already been noted, the customary tolerance in slat width is plus or minus 0.010″, it will be seen that the exact location of the junction between the upstream terminal slat of a block being separated, and the leading slat of the integrated column of slats can vary as much as .280″ from the design location. As there are good reasons, which will be detailed hereinafter, why it is desirable to have the wire cut precisely at the junction, the entire cutter assembly is so mounted that it can be quickly and easily adjusted to move upstream or downstream, through a distance of about one-half inch from the design position, and can thus accommodate slats which are "running" up to the maximum plus tolerance or down to the maximum minus tolerance.

141. The cutting action occurs during a period of the cycle when the slat-pushing ram is not advancing the integrated column of slats and thus the slats under the knife are not in motion. The next advancement of the column of integrated slats serves to push the completed rough block past some edging saws which trim the respective edges to a dimension very close to its final length (dimension parallel to the length of the slats), and the next advancement of the integrated column of slats drives this block to, and partially through, a block stretching area, the specific design of which was changed during the course of this litigation, but the operative function of which has remained identical.

142. Referring to Pl.Ex. 12H, at this spacing station there are two elongated apertures in the bed of the machine, each extending parallel to the direction of movement of the slats. A steel spacing skid, having an arcuate surface, extends through each of those apertures to create a smoothly transcending "hump" in the

path of the intermittently advancing blocks which the blocks must pass over. At this point the solid guard rails overlying the edges of the slats are relieved and replaced by pieces of spring metal which are sufficiently flexible as to allow the slats to ride up over the "humps" and then, having done so, return to a position on the bed of the machine. These arcuate platens are so mounted that their specific elevation above the bed of the machine can be readily adjusted by manipulation of an adjustment wheel, the details of this arrangement being unnecessary to consider.

143. What must be considered, however, is that while since October 1964 these curved platens have simply consisted of curved pieces of metal which do not experience any movement other than occasional overall vertical movement in response to hand manipulation of the adjustment wheel when the height of the hump is being changed, the fact is that prior to October of 1964 those arcuate platens were, in actuality, the periphery of 6-inch steel wheels which were pivotally mounted on vertical adjustable frames disposed under the bed of the machine, as shown in Pl.Ex. 18.

144. Theoretically, those wheels were free to turn as the blocks passed over them, and thus evenly distributed the wear about their entire periphery, but the fact is that those wheels were frequently jammed with wood chips cast off by the edging saws and thus became frozen in one position. When this occurred they were, at least in terms of function, identical with the curved platens defined by the structures now being employed.

144A. The Defendants acknowledge that the present arrangement was obtained by the simple expedient of using a welding torch to freeze the shafts of the stretching wheels and then using a cutting torch to remove enough steel from the wheels so that they would not respond, even in literal terms, to the word "cylinder" as used in the Yellow patent, and that the only reason they did this was to dramatize certain of this contention of non-infringement. It has always been the Defendants' contention that those wheels did not operate in the manner of the "cylinders" specified in the claims in suit of the Yellow patent, or meet the Yellow patent's purpose, and the fact that they could be so altered in shape so that they were not cylinders in any sense of the word, but could still serve their intended function in precisely the same manner, would serve to emphasize the difference between the Yellow patent's use of a cylinder (which is critical to its operation) and the Cloud machine's incidental choice of a cylindrical shape for its curved stretching platens.

144B. Insofar as performance is concerned, that is to say the obtention of spacing between the slats of the block passing over the spacing device, it makes absolutely no difference whether the spacing device consists of a pair of arcuate skids projecting through apertures in the bed of the machine, or consists of portions of wheels or drums extending through apertures in the bed of the machine. The results obtained will be identical so long as the devices are raised to extend above the bed of the machine the same distance. In either case the total amount of spacing, i. e. the sum total of spacing in the six spaces between the seven slats of a given block, can be controlled to Cloud's satisfaction (Cloud's rather crude test is whether light can be seen through most of the cracks) by raising or lowering the spacing device as a whole. However, by their very nature, neither form of spacing device can obtain equal spacing between all of the slats of a given block.

144C. The inability of the Cloud spacing devices to impart equal spacing between all of the slats of a given block stems from the fact that they cause slippage between the wires and the slats. Due to the non-homogeneity of wood, the frictional engagement between the wire and the individual slats is not uniform, and thus a given quantum of stretching force will result in varying amounts of slippage between the wire and the in-

dividual slats. Moreover, the amount and duration of the stretching force is not uniform because some slats reside on the hump of the spacing device during pauses in the intermittent advancement of the block, whereas other slats quickly pass over this hump during the portion of the cycle when the blocks are being advanced.

144D. The fact that neither of the post-insertion stretching devices that have been employeod on the Cloud machine are capable of imparting equal spacing to a block presents a vivid contrast with the manner wherein the installation of the retaining element while the *entire block* is in an arcuate configuration (as employed in the Tibbals patents in suit, or in Bruce Patent No. 2,113,076, Def.Ex. 7CC) *must* result in equal spacing, which is always precisely the same, between the slats. Stated otherwise, in the Cloud machine one *must* get a variation in spacing and in the Tibbals machine one *cannot* get a variation in spacing.

144E. The differences between the intention, purpose and function of the 6½″ stretching wheels used in the Cloud machine prior to October 1964 (Pl.Ex. 18), and the 40-odd inch wheels of the Yellow, Black and Blue patent machines, are dramatized by the fact that the freezing of the Cloud wheels will not have any effect on the overall operation of the machine or the amount of spacing imparted to the blocks, whereas the freezing of the abovementioned wheels of the Yellow, Blue or Black patent machines would, of course, make those machines completely inoperable.

145. After a block has passed over the curved platens, and thus experienced a stretching which is similar in kind, if not in the selectively variable degree to that of a block passing through the curved channel of the Red patent, the block is discharged from the end of the bed of a machine.

145A. Once the slats have been placed on the bed of the assembly machine through the action of the cross-feed ram, the only motion experienced by any slat in the integrated column of slats is solely the product of the advancement of the slat-pushing ram. Thus the advancement of the slat-pushing ram is the only agency which brings the slats into contact with the pressure relief rollers, and is the only agency which forces the wear surface longitudinal edges of the slats into abutment with each other during their journey through the assembly machine, and is the only agency which causes the slats to pass over the "hump" created by the stretching device (whether in the form of skids or in the form of a roller), and is the only agency which causes the slats to leave the stretching device and be discharged from the end of the machine.

145B. The flexible strips which extend over the humps serve to press the slats against the curved surface of the platen. However, as the only force exerted by the strips on the slats is in a direction radially inward of the curvature of the platen, the strips do not, and cannot force the edges of adjacent slats to bear against one another. That office is only performed by the slat-pushing ram as it advances the entire column of slats.

146. If the cutter assembly has been properly located, the operator, called an "off-bearer," simply lifts the block off the bed of the machine as it is being discharged. But if the cutter assembly has not been properly positioned relative to the "run" of the slats, and if the cut in the wire is therefore located within the confines of either the rearmost terminal slat of one block, or the forwardmost terminal slat of the following block, the operator has to wrench the blocks apart, the amount of force being required being, of course, a function of how far the cut is from the design position. If the cut is as much as .150″ (which is less than ⅛″), from the design position, a considerable amount of difficulty is experienced.

147. The operating procedure is that when there is a change in the way the slats are "running" and the operator begins to encounter difficulty in picking

up the completed blocks, or otherwise notices that location of the cut has begun to wander from the design position, he makes suitable adjustment in the position of the cutter assembly by manipulation of a knob located at his station and connected by suitable linkages to the cutter assembly positioning mechanisms, which are not necessary to detail here. (Tr. 370)

148. Not only does the cutting of the blocks at a point away from the design position cause difficulties for the operator but, further, it tends to cause difficulties in the sanding and cutting and grooving apparatus to which the rough blocks are dispatched for final finishing.

149. By definition, if the cuts are located within the confines of the terminal slat of one block, the wire will, when the blocks are separated, project a commensurate amount beyond the edge of the terminal slat of the next block. Such projecting wires, called "rat tails" from time to time at the trial, have a tendency to jam the blocks in the feeding hopper wherein they await dispatch to the finishing operations and, further, have a tendency to cause the blocks to ride improperly in the conveyors which carry them through the trimming operations.

150. For purposes of this case, the trimming operation can be described in very general terms. Rough blocks are first passed through a sander which sands the underside, then passed through several passes of increasingly fine sandings on the wear surface, and then passed between two tongue-cutting saws which cut tongues in the two sides of the block which are made up of the edge-grain ends of the slats. The block is then transferred to another conveyor and passed between two grooving saws which cut the tongue-receiving grooves in the sides of the block defined by the longitudinal edges of the respective terminal slats. In this last operation the grooving saws will contact the wire and trim away a small portion of the bottom periphery thereof. However, as the wire is aluminum, which is, of course, markedly softer than steel, the presence of

the aluminum in the path of the grooving saws is a matter of no consequence. It should also be noted that in order to achieve the design sizing of the finished blocks, the grooving saws do not simply cut a groove but, rather, trim away a small amount, approximately ⅛", of the wood comprising the terminal edge of the respective terminal slats. In so doing they also, of course, trim away the wire that resides in the groove in that portion of the slat, even if the cut of the transverse grooves is so shallow that the wire does not extend down to the level of the groove to be cut in the edge of the block.

150A. In the abovementioned trimming operation, the time expended between the placing of the rough block in the feeding hopper and the completion of the finishing operation will vary somewhat, depending upon how many other blocks are already in the hopper. However, in no event does the completion of the entire finishing operation take over 90 seconds (Stipulation, p. 1270).

150B. At the beginning of the finishing operation, the rough block which has just been discharged from the block assembly machine has square edges, but the block as a whole is not "square", i. e. a given edge does not necessarily extend at right angles (in a horizontal plane) to its neighboring edges. The block as a whole is only squared through the operation of the finishing knives which create the peripheral tongues on two edges and the peripheral grooves on the other two edges. Thus, the block is never, at any time during the entire Cloud operation, a *squared* square edge block suitable for use as a so-called "unfinished parquet block" which can be laid as a part of a floor which is to be finished *in situ*.

151. In the event that a change in the way the slats are running causes the knives of the Cloud machine to cut within the confines of a terminal slat of two adjacent terminal slats, and the position of the cutter is not corrected, the next cut will be within the confines of a slat which will not end up in the same block as the first-mentioned slat. It is, there-

fore, for all practical purposes impossible for the Cloud machine to ever make a cut within the confines of two terminal slats of a given block being produced.

152. The Plaintiff contends that the cutting knives described above serve to clinch the wires. While it is undoubtedly true that in any instance where a piece of metal wire is cut against a backing of wood the metal will clinch into the wood to some degree, the aluminum wire here utilized is so soft, and the knives employed by Cloud are so sharp, that this inherent deformation must be measured in terms of a few thousandths of an inch, and certainly not over .010″ or a fifth of the diameter of the wire. Moreover, even this minimal inherent deformation will have at least a tendency to be removed when the block is later stretched by passage over the arcuate platen. Finally, it must be noted that even if one does call this inherent deformation a "clinching", and this Court does not so designate it, this deformation will, by definition, be cut away by the action of the grooving saws during the finishing operation and therefore does not have, and cannot have, any lasting effect upon the finished block.

152A. To bring the "not over .010-inch" dimension mentioned above into proper perspective, it must here be noted that we are here speaking of a wire 6¼″ long, and that the .010″ figure is about twice the thickness of a sheet of good writing paper.

152B. While the Plaintiff argues that the existence of a deformation of up to .010″ during the 90 seconds in question gives a significant benefit in terms of enhanced longitudinal strength of the rough block during the finishing operations, this "benefit" is certainly not evident from the Court's observation of the finishing operation. As there was no testimony about any such "benefit" by any witness, and as there was no effort to demonstrate this theory in practical terms during the course of the many experiments which were conducted, as a part of the trial, upon the Plaintiff's request, at the Cloud plant, the Court must find that this "benefit" is completely speculative and was not established at trial.

152C. The existence of a deformation of less than .010″ for not over 90 seconds presents a vivid contrast with the procedures of the Black patent, wherein the clinching is sufficient to create a staple effect to anchor and retain the terminal slats during the weeks or months while the block is waiting its final installation and, indeed, during the decades wherein the block is installed as a part of a finished floor.

153. In actuality, the creation of a clinch in the wires in the cutting operation is inherently incompatible with the Defendant's practice of subsequently stretching the slats—it would simply create an additional impediment to obtaining the desired spacing as the slats passed over the arcuate platen defined by the "hump" of the stretching skid or the stretching wheel.

154. In like manner, the knurling of the areas of the wires which are in contact with the walls and/or the bottom of the grooves would be incompatible with the Defendant's practice of subsequently stretching the slats—it would simply create an additional impediment to obtaining the desired spacing as the slats passed over the arcuate platen defined by the "hump" of the stretching skid or the stretching wheel.

155. In like manner, the use of any technique to obtain a tighter frictional engagement between the wire spline and the wall of the slats than was taught by the prior art would be incompatible with the Defendant's practice of subsequently stretching the slats—it would simply create an additional impediment to obtaining the desired spacing as the slats passed over the arcuate platen defined by the "hump" of the stretching skid or the stretching wheel.

156. The creation of a clinch in the wires of the Cloud block is inherently incompatible with the stated intention of the designer of the machine to leave the slats free to engage in minute movement

along the wire spline in response to hygroscopic expansion and contraction.

157. In like manner, the knurling of the wires of the Cloud block would be inherently incompatible with the stated intention of the designer of the machine to leave the slats free to engage in minute movement along the wire in response to hygroscopic expansion and contraction.

158. In like manner, the use of any technique to obtain a tighter frictional engagement between the wire spline and the walls of the slat than was taught by the prior art would be inherently incompatible with the stated intention of the designer of the machine to leave the slats free to engage in minute movement along the wire spline in response to hygroscopic expansion and contraction.

159. While the rough blocks which are discharged from the Cloud block assembly machine are square edged in the vertical sense, they are only generally square in the horizontal sense and would have to go to a trimming machine for a squaring operation before they would be commercially useful as square edge blocks.

159A. The difference in concept between the Black patent machine and the accused Cloud machine is illustrated by the fact that the former is designed to work with steel wire, whereas the Cloud machine could not be used to install steel wire unless it were so modified as to have knives which cut far enough within the respective terminal slats to avoid interference with the finishing tools and, further, had a means to remove the short remnant of wire which would extend from the central portion of a trailing terminal slat of one block to the central portion of the leading terminal slat of the next block to be formed. Such a remnant picker would not work effectively unless the machine were further modified to incorporate some sort of spacing between the groups of slats destined to compose one block and the neighboring groups of slats which are destined to compose other blocks, i. e., to change the Cloud feed from that which creates an integrated column to one which employs means for segregating the respective groups of slats, and separating them from one another, before advancing them to the wire insertion station.

159B. It is clear that the wire of the Cloud blocks will satisfactorily retain the slats against displacement as a result of the ordinary forces, jars, shocks, etc. incident to the finishing and packing of the blocks at the factory, and the unpacking and installation of the blocks by the flooring contractor. However, the Defendant does not do anything to give it a *tighter* engagement than is necessary to meet those old and commonplace objectives. Indeed, the quantum of frictional engagement between the wire and slats is purposely kept *low* enough that the slats can move relative to the wire when the block experiences enough moisture to cause hygroscopic expansion. Considering that the slats of the Cloud block are randomly spaced, with some slats abutting their neighbors, and some slats spaced from their neighbors more than the figure (approximately .007") that would be required to avoid contact between the slats as a result of such expansion, it follows that such movement relative to the wire must occur. Thus the Cloud wires do not serve to *retain* the slats in a spaced relation to compensate for moisture expansion of the slats relative to each other.

159C. The Cloud block's concept of random spacing between the slats, and the provision for slat movement along the wire in response to hygroscopic expansion, presents a sharp contrast with the manner wherein the slats in the blocks produced by all of the Tibbals machines were precisely spaced from their neighbors by such a distance that normal expansion of a slat would not cause it to impinge upon a neighboring slat, and hence would not force a neighboring slat to move relative to the wire. The necessity for movement of the Cloud slats presents a particularly strong contrast with the product of the Black patent machine (i. e. the Brown patent block), the fundamental purpose of which is to *avoid* such relative movement

by the utilization of a knurled wire, and by the utilization of the anchors that are obtained by the clinching step to keep the slats in their original spaced arrangement, i. e. to keep them from ever getting so close together that they will impinge upon one another upon subsequent hygroscopic expansion.

159D. The necessity for movement of the Cloud slats after the application of a retaining member, e. g., the wire, also presents a strong contrast with the procedures of the Yellow patent, wherein any effort to move the slats relative to each other, or relative to the paper retaining member, after the installation of the retaining member, would necessarily result in the destruction of the retaining member or the destruction of the attachment of the slats to the retaining member.

*The Rebick British Patent Machine*

160. The Rebick British patent machine differs from the Cloud machine in a number of mechanical details, such as location of the drive shaft, etc. Only the differences which have figured in this litigation need be mentioned here.

161. The original Rebick British patent machine did not provide the pressure relief rollers under the wire insertion wheel that are discussed in Finding 138. However, when it was found that the downward force exerted by the wire insertion wheels on the slats, as it pressed the wire spline into the grooves, was such as to cause undue wear on the bed of the machine at that point, Mr. Rebick modified all of the British patent machines that he had built at that time to incorporate pressure relief rollers at this point, and he included such pressure relief rollers in all subsequent machines that he built. The relief of friction in this manner was simply a common expediency. It was never the intention of Mr. Rebick that these pressure relief rollers also serve as a means to obtain spacing, and he neither dimensioned nor located them in such a way that they could perform that office.

162. The pressure relief rollers were installed at the time the machines in question were delivered to Cloud Oak (I).

163. The original British patent machines employed different cutting knives from those employed in the Cloud machines. These cutting knives consisted of sets of double knives, spaced ¼″ (0.250″) apart with the blades extending parallel to the edges of the slats. They are still used in the Toronto operation but present disadvantages not presented by the Cloud machines (Tr. 754). These knives were not employed in the Cloud machines at the time they were located in Oil City, and were not installed at the time the machines were purchased by Cloud. In this respect it should be noted that considering the fact that the Cloud's subsequent trimming operations take off ⅛″ of wood, and also cut into the wood almost another ⅛″, the use of knives that cut within ⅛″ of the edge would not serve to prevent interference between the wire and the trimming knives, and thus would not meet the stated objectives of the Blue and Black patent machines.

164. The original British patent machines were constructed with the cutter assembly located just downstream of the slat-stretching device which, incidentally, consisted of slat-stretching rollers like those used in the Cloud machine prior to October 1964 (Findings 142–144). When the slat stretcher was so positioned, only one end of the wire was free to slip, and thus the reversal of locations of the cutter assembly and the spacing wheel in the Cloud machines resulted in a structure which facilitated the obtention of the desired slip (Tr.). This modification also represented an improvement in that it reduced the amount of tolerance building between the slat-pushing ram and the cutter.

165. The British patent machines, like the Cloud machines, do not obtain an equal spacing between the individual slats. The reason for this is not fully understood, but it is the opinion of its designer, as well as of the Cloud expert,

that the unevenness in spacing results, at least in part, from the fact that some slats remain on the "hump" of the stretching device for a relatively long period as compared with others, as a result of the intermittent operation of the slat-pushing ram. Another factor which undoubtedly contributes to the variance in spacing is that wood is not a homogeneous material, and hence some slats will have more of a tendency to slip on wire than others. It is significant, for purposes of this case, that neither of these factors can effect the spacing technique employed in the machines of the Tibbals patents, a fact which serves to emphasize the fundamental difference in the spacing concepts employed by the Cloud machines vis a vis the Tibbals machines.

### The Tibbals Patents

167. On May 6, 1957, Mr. Tibbals filed a patent application entitled, "Method of and Apparatus for Making Parquet Flooring Blocks", which was given Serial No. 657,184. The disclosure of this application was, for purposes here practical, identical with that of the Yellow patent which eventually issued thereon. This application, as originally filed, presented both apparatus claims and method claims.

168. On June 18, 1965, Mr. Tibbals filed a patent application, entitled "Method of and Apparatus for Making Parquet Flooring Blocks", which was given Serial No. 666,322. The disclosure of this application, which is styled as a continuation in part of application Serial No. 657,184, was, for purposes here practical, identical with that of the Blue patent which eventually issued thereon.

169. On July 2, 1957, Mr. Tibbals executed, and on July 5, 1957 filed a patent application, entitled "Flooring Block", which was given Serial No. 670,184. This application, which did not claim a lineage with any other application, disclosed flooring blocks made up of groups of relatively narrow slats, secured together by wires recessed in pairs

of transverse grooves in the non-wear surface of the blocks. This application disclosed two particular species of such block. One disclosed species employed foreshortened, knurled steel wires which only extended from a point short of the terminal edge of one terminal slat to a point short of the terminal edge of the other terminal slat, the statement being made that such an arrangement makes it possible to use high tensile strength steel wire and still avoid the damages to milling machines that would result from interference of such wires with the knives of those machines. Thus, this species was plainly directed to the product of the Blue patent machine. In a second species disclosed, an aluminum wire is utilized. It is there noted that since the aluminum wire cannot damage the milling knives, the wire can extend all the way from one terminal edge of one terminal slat to the terminal edge of the other terminal slat. This application makes no reference to the size of the slats, or the blocks made therefrom, other than to suggest that the slats may be made up of scrap left over from the manufacture of conventional tongue and groove flooring and, to that extent, suggests that the thickness of the slats could be anywhere from $\frac{3}{8}''$ to $\frac{33}{32}''$. (Pl. Ex. 1B)

170. This application was, on February 27, 1961, abandoned in favor of another pending Tibbals application, Serial No. 10,752, filed February 24, 1960, which will be discussed in a moment.

171. On January 29, 1958, Mr. Tibbals filed a patent application entitled, "Wood Parquet Flooring Block and Method and Apparatus for Producing the Same", which was given Serial No. 711,868. The disclosure of this application was, for purposes here practical, identical with that of the Black patent which eventually issued thereon. This application, as originally filed, presented both apparatus and method claims relating to the operation of the Black patent machine and also presented claims directed to the flooring block produced by the Black patent machine. It

neither disclosed, nor claimed, a block having a straight aluminum wire extending from the outside edge of one terminal slat to the outside edge of the other terminal slat. This application was styled as a continuation in part of the pending applications, Serial Nos. 657,184; 666,322; and 670,184.

171A. While the Black patent application, Serial No. 711,868 related to an assembly machine which was, in fact, used to bind blocks with knurled soft steel wire and thus was used to manufacture a block which *both* (1) had the wire *knurled* to *retain* the slats in their spaced relation, and (2) was sufficiently *flexible* to be *able to accommodate subfloor irregularities,* the Black patent application specification did not mention the ability of the block to accommodate subfloor irregularities.

172. On February 24, 1960, Mr. Tibbals filed a patent application entitled, "Wooden Parquet Flooring Block and Method and Apparatus for Producing the Same", which was given Serial No. 10,572. This application was originally styled as a continuation in part of the pending applications, Serial Nos. 657,-184; 666,322; and 670,184, but later converted to a division of application, Serial No. 711,868. The disclosure and drawings filed were identical to those which had been previously filed in his application, Serial No. 711,868, and the three claims presented were directed to the parquet flooring block produced by the Black patent machine, and were specifically limited to blocks having clinched wire splines, and did not disclose, or claim, a block having a straight aluminum wire extending from the outside edge of one terminal slat to the outside edge of the other terminal slat.

172A. The Black patent did not contemplate the use of an unclinched aluminum wire extending from a terminal edge of one terminal slat all the way to the terminal edge of the other terminal slat.

172B. As the Brown patent was styled by Tibbals as a division of the Black patent application, and as its Oath recites that it only discloses and claims "only subject matter disclosed in" the Black patent application, it must follow that the Brown patent application did not contemplate the use of an unclinched aluminum wire extending from a terminal edge of one terminal slat all the way to the terminal edge of the other terminal slat.

173. In seeking to overcome a rejection of the Blue patent application, which was based on the patent to Newton, (Pl.Ex. 7Z) (which is a companion case to the patent to Newton comprising Pl.Ex. 7T, referred to hereinabove), on the stated ground that Newton recites the severing of the retaining wire flush with the ends of the slats, Tibbals, in the amendment dated September 9, 1958, page 12, stated:

"At best Newton proposed the shearing of the wires flush with the ends of the strip. *This is not applicant's claimed invention.*"

In explaining this representation—that his invention did not encompass shearing of the wires flush with the edge of the wood—Tibbals urged that the advantage of the Blue patent technique was that it insured that the ends of the wires were far enough *within* the confines of the block to bar the possibility of contact between ends of the wire and the finishing knives, thus eliminating any possibility of damage to the finishing knives. The Plaintiff's present contention—that the language of Claims 9 and 10 encompasses Cloud's step of cutting the wire substantially *flush* with the edges—is wholly inconsistent with this earlier representation to the Patent Office as to the nature and scope of his invention, a representation that was made in an effort to secure issuance of the Blue patent.

173A. Claims 9 and 10 of the Blue patent were submitted to the Patent Office, in an amendment, filed August 10, 1960, as application Claims 17 and 18, with the following representation:

"New claims 17 and 18 are a redrafting of claims 2 and 3 and each include as a main feature the concept

234

of cutting or severing the binding wire within the grooves, intermediate the edges of a terminal slat of the group of slats. It was pointed out to the Examiner at the interview that while Newton suggests severing of the binding wire after insertion in the groove, that Newton clearly means that the wires are severed 'either flush with the end of the strip, or enough loose wire may be left so that the front and rear ends may be turned over to form the clamps.' (Newton patent p. 3, col. 1 at lines 37 to 39 inclusive)

"Severing of the wire after insertion in the groove, and short of the outside edge of the terminal slat (i. e., *within the groove*) precisely positions the end of the wire *from the end edge* of the terminal slat *so that enough free wood* is present for finishing operation without interference from the wire;"

The significance of the words *"enough free wood"* can not be ignored. That definition of the intention of the claims plainly excluded any thought of cut which extended into a terminal slat an incremental distance. The Plaintiffs' present contention—that those claims should now be construed as covering a procedure wherein the wires are cut in such a way that a *part* of the cut extends within the groove a few *thousandths* of an inch—is wholly inconsistent with this representation as to the meaning and scope of those claims. Further, the Plaintiffs' contention that these claims will cover Cloud's activities when the cut is displaced from its design position a few *thousandths*, say even 100 thousandths, becomes utterly inconsistent with these representations when one considers that the cut would have to be *maintained for at least .250"* from the edge to even begin to obtain the advantage needed, i. e., the *guarantee* of *enough* free wood to prevent interference with the finishing operation.

174. In the amendment to the Blue patent application, filed June 10, 1960, which amendment included the first sub-

mission of the claims which matured into method Claims 9 and 10 of the Blue patent, which were directed to *method* of cutting a spline, albeit a round one (wire), Tibbals made the following representation to the Patent Office:

"It appears obvious that there is no cutting action whatever contemplated in the * * * Tibbals spline devices. Any attempt to sever the splines, rods, or wires of the cited references, leads to damage of the flooring block."

This was not a passive or negative argument. This was a flat representation to the Examiner, by a prominent industrialist in this art, of the then present state of the art—of what could and could not be done with known equipment.

In truth, however, at the time this representation was made, Tibbals was in fact cutting splines on the Tibbals device under discussion, i. e., the commercial version of the Red patent machine. He was doing this every few *seconds,* and *had been doing so* in his commercial production for a number of *years* prior to the conception of the Blue patent machine. Thus Tibbals plainly and purposefully took improper advantage of his prominent position to mislead the Patent Office on the state of the art.

175. The entire prosecution of the Blue patent application was founded on the premise that no one had ever before employed a method which included the steps of cutting a spline, of any variety, within the confines of a terminal slat. The genus was in the four steps of *grouping, grooving, inserting,* and *cutting* the spline within the confines of the terminal slat.

176. The claims in suit, being method claims, were not directed to apparatus or particular structure. They were directed to a specified sequence of *actions*. It is for this reason that points of novelty in method claims are characteristically expressed in verbs and adverbs; why the point of novelty in apparatus claims are expressed in terms of nouns and adjectives.

At one point, in an Amendment, filed October 28, 1959, Tibbals, after referring to a rejection based on a wire spline which extended to the edge of the slat, and was there cut off, combined with a reference to a precut foreshortened V-shaped spline, correctly urged that neither of these showed the *combination* of those two concepts, i. e. the cutting of either type spline within the confines of a slat. He asked the Examiner, "Where is there a teaching of the combined method steps * * *?" Unfortunately, the Examiner did not know the answer to that question. The answer to that question was that that *sequence of steps* was, and had been for many years, performed right in Mr. Tibbals own plant, i. e. through the operations of the commercial version of the Red patent machine.

178. In the course of prosecuting the Application that matured into the Blue patent, Mr. Tibbals, in the Amendment filed September 9, 1958, distinguished the concept of using a knurled wire which was installed in a block when the splines were in a spaced condition, and the post-insertion stretching taught by the Tibbals patent, by pointing out that the post-insertion stretching of a block bound together with a knurled wire would result in the wire galling out the slat to such an extent that a tight assembly of the wire in the slat slots would not be obtained.

178A. The position taken by Mr. Tibbals in the September 9, 1958 amendment is completely consistent with Mr. Rebick's testimony at trial that the use of a knurled wire is not compatible with the concept of a post-insertion stretching step. Moreover, both of these views are completely consistent with Mr. Tibbals' statement in the amendment filed on August 10, 1960 in the Blue patent, wherein it was observed that:

" * * * forcing a knurled wire into the slats while the slats are in a concave configuration prevents the gripping action between the knurled wire and the groove from being destroyed, as would be the case in Tib-

bals patent 2,650,627 [the Red Patent] where the spline is affixed to the group of blocks prior to flexing and curving of the group of strips."

However, all of these positions are completely inconsistent with the Plaintiffs' present assertions that the Cloud postinsertion stretching operation is the equivalent of the spacing procedure employed in the Yellow, Blue and Black patents

179. During the course of the prosecution of the application of the Black patent, in an Amendment dated December 30, 1960, Tibbals, in referring to a prior art patent showing the use of the spline like that employed in his Red patent machine, represented to the Patent Office as follows:

"As noted earlier, it is obviously a decidedly difficult task to sever a rigid spline in wooden blocks as distinguished from severing the wire according to the applicant's invention."

As just noted, Tibbals now concedes, but did not advise the Patent Office, that he had been so severing rigid splines for years, in the groove of a slat, without difficulty of any kind (Tibbals, 9/17/63, pp. 123–124). In making this representation, Tibbals again misused his position in the industry to purposefully mislead the Patent Office on the state of the art.

180. In the course of prosecuting the Black patent application, and, more particularly, in the Supplemental Amendment, dated January 27, 1961, Mr. Tibbals, in seeking the allowance of Application Claim 16, which matured into Patent Claim 12, represented to the Patent Office that it was important to combine the concept of using foreshortened wires and clinching at the end of the wires because the clinch would help make up for the reduction in frictional engagement caused by foreshortening of the wires.

180A. The word "knurled" normally connotes the presence of a significant amount of roughening dispersed about the entire periphery of a wire. Moreover, the record makes it plain that that term, as used in all of the Tibbals patents relating to wire-bound blocks, connotes

the presence of a significant amount of roughening dispersed about the entire periphery of the wire so that the wire will, when disposed in a transverse groove having a width which is less than the diameter of the wire, be *certain* to grip the side walls and bottom of the groove with a tighter and stronger engagement than would be obtained if the portions of the wire in contact with the wood were smooth. As these patents do not contemplate any effort to angularly index the wire as it is installed in the groove, and as the equipment to so angularly index a small gauge wire would obviously be complex and troublesome, the only way one can be certain to obtain the desired enhanced grip is by insuring that the wire has the knurling dispersed about its entire periphery.

181. During the course of the prosecution of the Brown patent, and the various predecessors to the Brown patent, Tibbals represented to the Patent Office that the use of knurled wire made it easier to piece out the blocks during installation, that is to say, to break the block for installation at the edge of the room, and that this feature eliminated considerable cutting which would otherwise be required in fitting around the edges of the room, around plumbing fixtures, etc. The Court found that there was no appreciable difference in the amount of work required to so hand flex the blocks of the respective parties as to break off one or more slats as desired, and further, with regard to a test of wire which was run through the Cloud machine with a smooth insert wheel, again found no appreciable difference in ease of breaking off a slat. In regard to piecing around plumbing fixtures, or in other places where breaking off the block at the intersection of two slats would not provide a proper fit, the Defendants' product would appear to be preferable in that a cut down the center of the slat can be made with ordinary woodworking tools which easily cut through aluminum wire, whereas a similar operation with the Tibbals Flooring block requires the use of a portable band saw.

182. The word "flexible" as used in the claims of the Blue patent application has no definitive antecedent in the specification of the Blue patent. While the specification indicates that a knurled wire 0.04″ in diameter, but of an otherwise unspecified character (column 8, lines 54–57), will meet this definition, there is no indication of what other wires, of other sizes, materials, and characteristics, will meet the definition intended. In the absence of a definition, the term "flexible" as so used must be deemed as meaning capable of being flexed by hand.

183. The word "flexible" as used in the claims of the Brown patent has no definitive antecedent in the specification of the Brown patent, and in the absence thereof must be deemed as meaning capable of being flexed by hand.

184. Ths word "flexible" as used in the claims of the Brown patent must be deemed as encompassing all that is encompassed by the same use of the word "flexible" in the Blue patent, including particularly the high tensile steel wire which, according to the Black patent, is the material envisioned in the Blue patent, and which, according to Mr. Tibbals, is "springy."

185. The expression "small gauge" as used in Claims 9 and 10 of the Blue patent has no definitive antecedent in the specification of that patent. While this patent mentions (column 8, lines 54–57) that a wire having a diameter of .050″ can be used, there is nothing in the patent to suggest that the method and apparatus described therein should not, or could not, be used with a wire having a different diameter.

186. The expression "small gauge" as used in Claim 4 of the Brown patent has no definitive antecedent in the specification of that patent.

186A. The blocks illustrated in the Blue and Brown patents have a wire diameter which is approximately one-sixth the thickness of the slats. If the term "small gauge" is deemed to relate to the relationship between the wire diameter

and the slat size, it is significant to note that the flexible wire 39 in Newton's (Pl. Ex. 7T) Figs. 8–11 has a diameter which is about one-seventh of the thickness of the parquet block; that both of the wires in the French patent (Pl.Ex. 7UU) to Dupuy (i. e. the wires in the side grooves or the wires alternately located in bottom grooves) have a diameter which is about one-fifth of the thickness of the parquet slat; that the wire in the British patent to Barclough (Pl.Ex. 7RR) has a diameter of about one-eleventh of the thickness of the block; and that the "wirelike" element of Ranta has a diameter approximately one-sixth of the thickness of the parquet slat. Considering that neither the Blue, Black, nor the Brown patent, nor any of the prior patents discussed above, specify any *required* dimensions of either the wire or the slats (although the Blue patent says that in *one* preferred embodiment the wire is about 0.050″), it will be seen that the Blue, Black, and the Brown patents can be fairly deemed as pertaining to the use of wires of about the same size as those shown in the prior art, and to the use of slats having about the same size as those shown in the prior art and, further, as pertaining to the use of a wire-size to slat-size ratio that is about the same as that shown in the prior art.

187. In regard to the expression "small gauge" as used in the claims of the Brown patent and the Blue patent, Mr. Tibbals was unable to specify what sizes a person skilled in the art would deem as encompassed by this term, and concluded by stating a "guess" that it would not include wire having a diameter over .100″. Considering that parquet flooring block has long been sold in sizes up to $25\!/\!32''$, and that for many years most of the parquet flooring block sold was $25\!/\!32''$ thick, and was sometimes employed in blocks as large as 18″ square, the term "small gauge," viewed in the context of the art, must be deemed as encompassing wire going up at least as far as .125″.

188. The respective elements of blocks comprising Def.Ex. 72 and 73 were selected as being mutually proportional to the blocks shown in the drawings of the Brown patent. It is further noted that Def.Ex. 72 is 9″ x 9″, and is composed of eight $25\!/\!32''$ slats, 1.114″ wide, and has a spline approximately .125″ in diameter, and that Def.Ex. 73 is 7″ x 7″, and is composed of eight .610″ slats, .820″ wide, and has a spline approximately .099″ in diameter. In each instance the slats are spaced .011″.

189. There is nothing in the specification of the Yellow patent which in any way suggests that it is directed to the assembly of any particular size block, or that its slats have any particular width, depth, length, or spacing. Thus it may be fairly deemed to relate in terms of slat length, width, depth, and spacing, if not in terms of the type of retaining element employed, to the construction of blocks like those comprising Def.Ex. 72 and 73.

190. There is nothing in the specification of the Blue patent which in any way suggests that it is directed to the assembly of any particular size block, or that its slats have any particular width, depth, length, or spacing. Thus it may be fairly deemed to relate in terms of slat length, width, depth, spacing, and wire size, if not in terms of wire length, to the construction of blocks like those comprising Def.Ex. 72 and 73.

191. There is nothing in the specification of the Black patent which in any way suggests that it is directed to the assembly of any particular size block, or that its slats have any particular width, depth, length, or spacing. Thus it may be fairly deemed to relate in terms of slat length, width, depth, spacing, and wire size, if not in terms of length of the wire or the configuration of the wire ends, to the construction of blocks like those comprising Def.Ex. 72 and 73.

192. There is nothing in the specification of the Brown patent which in any way suggests that it is directed to any particular size block or that its slats have any particular width, depth, length, or spacing. Thus, it may be fairly deemed to relate, in terms of slat length, width,

depth, and spacing and wire size, to blocks like those comprising Def.Ex. 72 and 73, the only difference between those exhibits and the blocks disclosed in the patents is that in the latter the wires are knurled and cut off and clinched short of the free edge of the terminal slat.

192A. Thus when the Plaintiff speaks of a new product composed of 5/16″ thick slats, each 7/8″ wide, and 6″ long, and having the degree of flexibility which is obtained by binding the slats together with a pair of .055″ soft steel wires, it is not speaking of a product which the Brown patent describes with particularity, or which the Brown patent's specification distinguishes from blocks having other widths, thicknesses, lengths, or spacing, or bound together with differently dimensioned wire which will give a block a different degree of overall flexibility or a different quantum of ability to accommodate variations or unevenness in the floor on which it is laid.

192B. It follows from this that considering the lack of dimensional co-identity between the Hartco blocks produced by Tibbals Flooring and the disclosure of the Brown patent, and the lack of co-identity in terms of specific spacing and specific quantum of flexibility, and considering that the Hartco blocks are peripherally tongued and grooved and are, therefore, incapable of adjusting to variations in the sub-floor as claimed by the Brown patent (Finding 197B), and considering that the Hartco prefinished blocks are said to have, and apparently do have, a superior finish which does in fact create a very attractive appearance, the record does not support a Finding that the commercial success of the Hartco blocks is the result of any improvement claimed in the Brown patent.

193. The term "relatively narrow" as used in the claims of the Brown patent do not define any specific width of the slat or any definite limitation on the width-to-length ratio. While the specification of this patent (column 3, lines 13–15) mentions a ratio of less than 1 to 4 as being exemplary of a "relatively narrow" slat, it does not present that ratio as a definitive formula. In this respect it is significant that in the course of prosecuting the application which matured into this patent, Tibbals characterized the slats of a Bruce block having a 1 to 3 ratio as being "narrow elongated slats".

194. Tibbals' real meaning in using the expression "relatively narrow" in the specification of the Brown patent was that the slats must be not more than one inch wide, a limitation which he regarded as critical and the basis of his development. However, as he did not mention this critical limitation in his patent, and thus failed to disclose to the public, in exchange for the grant of the patent rights, the best mode of carrying out the invention being claimed, that limitation cannot now be read into the Brown patent.

194A. The term "relatively narrow" has been given a wide variety of meanings by Tibbals during the various periods with which this case is concerned. This term was first used in the original specification of Application, Serial No. 670,184, filed July 5, 1957, to describe the slats portrayed in the drawings, and was also used in each of the originally filed claims of that Application. However, nowhere in this Application was there any suggestion that this expression had anything more than its rather general common language meaning. Moreover, during the subsequent prosecution of that Application, neither Tibbals nor the Patent Office attributed any special meaning to the words "relatively narrow". For example, although the pending claims (all of which used the expression "relatively narrow") were rejected one or more times on various references showing square blocks having 3 slats or 4 slats (i. e. a 3 to 1, or 4 to 1 length-width ratio), Tibbals never challenged the applicability of those references insofar as the term "relatively narrow" was concerned at any time up to the abandonment of that Application in favor of Application, Serial No. 10,752, filed April 24, 1960, which was originally

styled a continuation in part of Application, Serial No. 670,184 (Pl.Ex. 1A).

The specification of Application Serial No. 10,752 did not even mention the term "relatively narrow" except in reference to the elongated wooden strips from which the slats are cut (Pl.Ex. 1A, p. 7), which are seen in the upper left hand corner of Figure 1 of the Black patent. The claims originally filed with that Application again simply used the expression "relatively narrow" in their general language meaning. In the first Official Action, the Examiner cited Bruce Patent No. 2,113,076 (Pl.Ex. 7CC) as showing a block with "narrow elongated wooden slats" (Chron p. 36), and in his response, the Amendment dated February 16, 1961, Tibbals agreed that:

"Bruce discloses a flooring block having narrow elongated slats" (p. 7, Chron p. 45)

It must be noted that this Bruce patent illustrates blocks composed of slats which are ⅓ as wide as their length dimension and, further, that that patent states on its face that the materials of the block are the same as shown in Allen Patent No. 1,808,623 (Def.Ex. 20) which last-mentioned patent specifically describes the block shown therein as being made from shorts of conventional strip flooring.

Thus, as of February 16, 1961, Tibbals was agreeing that the term "relatively narrow", as applied to a slat in his claims, encompassed (a) lengths of ordinary strip flooring which (b) had a width-length ratio of 1 to 3.

On October 15, 1962 Tibbals offered an Amendment (Chron p. 66) (which was not immediately entered by the Patent Office) wherein some of the pending claims were restricted to recite that the slats had less than 1 to 4 width-length ratio. No effort was made to modify the specification to insert the words "relatively narrow", in a manner to modify the word "slats", or to insert any reference to any width-length ratio. That Amendment was accompanied by some "Remarks" which suggested that at a private interview the Examiner had indicated that the term "relatively narrow" was too broad and then went on to urge that the insertion of a reference to the 1 to 4 width-length ratio in the claims was being made to overcome that objection (Chron p. 72).

On November 30, 1962 the Examiner issued an Official Action (Chron p. 82), stating that the October 15, 1962 proposed Amendment would not be entered because it raised a variety of "new issues" and exemplified this objection by noting that "* * * the recitation of specific dimensions is considerably different from the recitation that the slats are 'relatively narrow' ".

On December 6, 1962 Tibbals petitioned the Commissioner (Chron p. 86) for an order instructing the Examiner to enter the Amendment of October 15. In referring to the controversial insertion of a recitation of a width-length ratio in the claims, Tibbals said:

"It should be emphasized that the applicant does not consider the specific recitation in the claims that the slat width dimension is less than one-fourth the length dimension thereof as being a patentable limitation in itself." (Chron p. 87)

On February 25, 1963 the Examiner issued an Official Action (Chron p. 89) wherein he treated the Petition as a request for reconsideration and allowed the entry of the Amendment as a whole, but then reopened prosecution of the case and rejected the claims which included the length-to-width ratio relating to the proportions of the dimensions of the slats as presenting new matter (Chron p. 92). The Examiner also pointed out that a 1 to 6 ratio in square edge slats was shown in an old patent issued in 1910 (Chron p. 93).

On May 27, 1963 Tibbals submitted an entirely new specification which generally described the blocks as being "composed of relatively narrow slats" (Chron p. 100) and which also included a paragraph (Chron p. 104) which described

the slats shown in the drawing in the following terms:

> "Moreover, the slats 32 are relatively narrow so that the width dimension 'w' of the wear-surface of the slats is less than 1–4 the length dimension 'l' thereof."

Putting to one side the question of whether this insertion presents a specifically limiting definition of the expression "relatively narrow" (see Finding 193), the fact remains that this was the first effort to mention a width-to-length ratio of the slats in any specification pending before the Patent Office, and that this occurred *after* Tibbals had observed the Cloud commercial operations.

In the "Remarks" inserted with this Amendment, Tibbals presented arguments for the allowance of the claims which included a recitation of the 1 to 4 width-length ratio (i. e. application Claims 4 and 5) which asserted that the "relatively narrow" slats were "at least narrower than standard hardwood strip flooring" (Chron p. 111). This, of course, presented a definition of "relatively narrow" which is quite independent of the width-to-length ratio of a given slat.

On September 11, 1963, the Examiner issued an Official Action (Chron p. 172) which rejected the proposed Amendment of May 27, 1963 in its entirety as failing to respond to the outstanding Official Action.

On September 26 Tibbals filed a Petition to the Commissioner (Chron p. 175) for an order directing the entry of the Amendment of May 27, 1963. Before this Petition was acted on, Tibbals' attorneys interviewed the Examiner and then filed an Amendment dated October 18, 1963 (Chron p. 207) which cancelled the last pending claims still reciting the length-to-width ratio, i. e. application Claims 4 and 5 (Chron p. 208) and replaced them with claims that simply described the slats as being "relatively narrow". Thus Tibbals finally acceded to the Examiner's repeated insistence that a limitation in the claims of the term "relatively narrow" to a less than 1 to 4

width-to-length ratio would represent "new material". In view of this acquiescence, Tibbals cannot now assert that the expression "relatively narrow slats" only means slats having a less than 1 to 4 width-to-length ratio. Moreover, putting this specific acquiescence to one side, Tibbals cannot, in any event, repudiate his early statement to the Patent Office that slats having a 1 to 3 width-to-length ratio are "narrow" within the meaning of the Brown patent application as *originally* filed, and cannot now repudiate his admission that such slats, formed of *stock strip flooring,* are "narrow".

Specifically, Tibbals may not now be heard to say that the expression "relatively narrow" excludes the 1½" or 2¼" wide stock strip flooring. After the Brown patent issued, Mr. Tibbals began to give the expression "relatively narrow" a third definition which is distinct and separate from his definition in terms of a width-length ratio, and is distinct and separate from his definition as being narrower than stock strip flooring, i. e. he testified that the term "relatively narrow" really meant that the slats were not over 1" wide (Tibbals, 9/1/64, pp. 66–71), but that this definition had not been mentioned in the patent because he regarded its "criticality" as being a trade secret. However, even with regard to this latest definition, which is in no way hinted at much less mentioned in the Brown patent, it is noted that years ago Tibbals produced blocks having 1" wide slats (Tr. 1046—9-slat 9" x 9" blocks) and, further, the Bond Wood blocks, whose competition originally stimulated all of Tibbals development work, had slats having a width less than 1". Indeed, at trial Plaintiffs' counsel noted the early Bond Wood blocks and then stated specifically that "Mr. Tibbals doesn't contend that he is the first one to make narrow slats".

195. The method and apparatus of the Black patent can only be utilized successfully to obtain an end-product block described therein as having the wire spline clinched into each terminal slat if care is taken to be sure that the knives have

been so sufficiently dulled that they will press the wire into the wood comprising the bottom of the wire-receiving groove prior to the completion of the severance of the wire. The Black patent makes no mention of this critical characteristic of the knives. The only illustration of the cutting knives shows them as being sharp (Figures 4 and 5), and the patent specification incorrectly represents to the public that the extent of deformation is determined by the radial extension of each cutter beyond the radial dimension necessary to merely sever the wire (Column 7, lines 67–70). Thus the Black patent fails to disclose to the public, in exchange for the grant of the patent rights, the best mode of carrying out the inventions being claimed.

196. The word "spaced" as employed in the claims of the Brown patent has no definitive antecedent in the specification of that patent other than the recitation that the spacing is designed to accommodate thermal and moisture expansion. Mr. Tibbals purposely avoided disclosing the measurement of the best spacing for the intended purpose, because he regarded this optimum spacing to be a trade secret. As the wood of the blocks is constantly changing size, due to hygroscopic expansion and contraction, and as the actual spacing between the slats is also constantly changing size, measurement of the spacing of the Tibbals Flooring, as it is sold commercially, would not tell an investigator the optimum spacing utilized by Tibbals Flooring in the initial assembly of the block. In making this decision, and in filing such a patent application and allowing the Brown patent to issue on such an application, Tibbals purposefully obtained a patent while knowing that he was not disclosing to the public, in exchange for the grant of the patent right, the best mode of carrying out the inventions being claimed.

197. While each of the patents in suit speaks of the use of the periphery of a wheel to obtain spacing, Tibbals purposely avoided disclosing the dimension of the wheel that was used to obtain the spacing in the 5⁄16″ block he was marketing because he regarded the optimum size of the wheel to be a trade secret. In making this decision, and in filing such patent applications and allowing the Brown and Yellow patents to issue on such applications, Tibbals purposefully obtained patents while knowing that he was not disclosing to the public, in exchange for the grant of the patent rights, the best mode of carrying out the inventions being claimed.

197A. The knurling imparted to the wires of the Tibbals Flooring blocks, which are assertedly produced under the Brown patent, makes it relatively easy to break the wire (and hence break the block into a narrow block for "piecing out" at the edge of a room) by the repeated flexion of two adjacent slats into and out of a co-planar relationship. Tibbals sought to incorporate a reference of this feature into his Brown patent application by virtue of the amendment of February 16, 1961 (Chron p. 37) but, when such an "amendment" was rejected as constituting "new matter," Tibbals acquiesced to the Examiner's refusal to allow such recitations in the patent that eventually issued.

197B. The file wrapper of the Brown patent demonstrates that the Patent Office repeatedly rejected claims directed primarily to spaced slats bound with a knurled wire (Claims 7, 14), or to flexible blocks bound with a knurled wire (Claims 10, 12), or to blocks with spaced slats bound with a flexible wire to accommodate sub-floor irregularities (Claims 17, 20), and that it was not until after *all* such claims were cancelled from the application, and were replaced with claims directed to blocks formed with compensatingly spaced slats (i. e. *sufficiently spaced* to compensate for future hygroscopic expansion) wherein:

(1) the wire was *knurled* (or in such *tight* engagement with the slats as) to *retain* the slats in those *spaced* positions, and

(2) the wires were *so flexible* that the blocks could, when laid, *ac-*

*commodate* sub-floor irregularities,

that *any* claims were allowed by the Examiner. As *all* the claims which were then allowed are limited to that specific combination (either with or without the anchoring of the wire), they cannot now be deemed as extending to any block which does not have all of the slats compensatingly spaced and cannot be deemed as extending to a compensatingly spaced block which does not incorporate *both* of these features.

197C. The file wrapper of the Brown patent also makes it plain that Tibbals only obtained allowance of such claims to that combination by convincing the Examiner that:

(1) The only round splines in the prior art consisted of rigid rods, or rigid wires of such a relative dimension that they amounted to "rods", as opposed to consisting of *flexible* wires, and that such rigid round splines would not allow their blocks to accommodate sub-floor irregularities; and

(2) While the use of *rods* which were roughened or barbed to hold slats *together* was generally old, the prior art did not show the use of a knurled wire to *retain* the slats far enough *apart* that they could experience hygroscopic expansion without bumping on another.

197D. The file wrapper of the Brown patent demonstrates that Tibbals frequently conceded that the fundamental idea of installing a spline when all of the slats were spaced far enough apart to allow space for future hygroscopic expansion was old.

197E. While the file wrapper of the Brown patent shows that the Examiner was aware of the existence of Newton patent (Pl.Ex. 7T), all discussions thereof in the file wrapper, whether by the Examiner or by Tibbals, were directed to the large heavy industrial floor block of Figs. 1–7, which is bound together with a large (.148″) rigid wire, and the Plaintiff conceded at trial that the Ex-

aminer had this embodiment in mind during all these proceedings. However, the fact is that Newton also showed, as a second embodiment, a conventional parquet flooring block bound together by a small fexible wire which is rather obscurely illustrated in Figs. 8–11, and whose presence is not apparent until one reads the antepenultimate paragraph of Newton's specification, and there learns what to look for in the drawings (Finding 46). That paragraph specifically teaches the use of a small flexible wire to bind the slats of parquet flooring blocks, and explicitly teaches that the flexibility can be selectively varied by the use of alternate sizes of, or types of, metal wire. The interchanges of comments on the prior art between Tibbals and the Examiner present persuasive evidence that the Examiner was never aware of the fact that Newton's discussion of that second embodiment presented a teaching of the selective use of wires having varying degrees of flexibility.

197F. The file wrapper of the Brown patent shows that the Examiner was aware of the Allen patent (Pl.Ex. 7N) but was persuaded by Tibbals that this patent taught the use of a wire having a diameter of not less than ⅛″ to bind together the slats of a block, and that such a wire would, as a practical matter, constitute a *rigid spline*. Stated otherwise, the file wrapper makes it clear that the Examiner did not recognize that a person skilled in the art of manufacturing parquet flooring block would understand Allen's Fig. 7 as teaching the use of a wire ranging from .053″ to .085″, depending upon the specific thickness of the slats (Finding 37), and hence did not recognize that Allen would be regarded by such persons as teaching the use of what would, in fact, be a flexible wire.

197G. The file wrapper of the Brown patent shows that while the Examiner was aware of the fact that equal spacing, created for the purpose of accommodating future moisture expansion, was shown in the prior art, e. g. in Bruce and the Tibbals Red patent, he seemed to be unaware of the fact that *any re-*

*taining means* that would grip the slats securely enough to give the customary resistance to slot movement in response to the stresses created in the usual handling of the blocks would *retain* the slats which are so spaced in such a way that they would not experience movement as a result of hygroscopic expansion. He did not recognize that *if* the spacing between *each* slat was larger than the combined normal expansion of the two edges of the slats which define the spacing, as taught in the prior art, *any* of the known *retaining means* would "retain the slats to compensate for thermal and moisture expansion" as recited in the Brown patent claims.

197H. The Yellow patent issued on January 21, 1964. On February 11, 1964 Howard H. Baker, the President of Wood Products executed a disclaimer to Claim 1 of that patent, under 35 U.S.C. § 253, and Charles E. Tibbals endorsed this paper as "acquiesced into by the inventor." The disclaimer was formally filed in the Patent Office on February 14, 1964.

198. One of the limitations of Claims 2 and 3 of the Yellow patent is that it is restricted to the "means for applying a common retaining element to the *surface* of said slats." In considering whether this expression would read on a means for applying a retaining element *under the surface,* as in applying a wire spline to be *recessed* in a groove, consideration must be given to the fact that during the course of the prosecution of the Yellow patent some of the claims which were presented to the Examiner, but later cancelled, and, indeed, some of the claims in the patent itself, clearly present language which is plainly broad enough to read on the placement of a retaining element in either way, i. e., in a groove or on the surface. In construing this expression, heavy weight has to be given to the fact that Tibbals chose to use the language he did in the claims in suit, even though he knew that the concept of applying a retaining element could be recited in broader terms. The fact that those broader terms were only used in claims which are, in other respects, severely limited to details of the Yellow patent machine (and thus are not even asserted to be infringed) leads to the conclusion that Tibbals knowingly and purposefully bargained for the language which appears in Claims 2 and 3 (broad here—narrow there) and this leads to the conclusion that he must be held to the literal meaning of that language. In reaching this conclusion weight must also be given to Tibbals' candid admission at trial that the product obtained from the Yellow patent apparatus is not comparable to a wirebound block, and that in a wire-bound product it was "important" that the wire be seated *below* the non-wear *surface* of the block.

■ 199. The Yellow patent is characterized by the Plaintiff as being directed to the obtention of spacing of slats being formed into parquet blocks. Considering that this apparatus is particularly directed to obtaining spacing in blocks having a paper web retaining element glued to its non-wear surface, and considering that this type of block is inherently unsuited for use in a process which includes the step of stretching the slats relative to the retaining element after the latter has been installed, it is evident that such blocks can only be mechanically spaced by either assembling the slats with some sort of spacer elements physically installed between the slats as in the Desagnot process which was old in the art, or by adhesively applying the web while the slats reside upon some sort of curved platen. Paricircular curved platens had, of course, been used for years and the use of the periphery of wheels or drums for the purpose of providing such a curved platen was also old in the assembly art, if not in the parquet block slat assembly art (Findings 56–60 and 67). The alleged point of novelty in the use of the structure of the Yellow patent was that it provides means for grouping the plurality of slats into a *segregated* assembly that will constitute the end-product block and placing that *segregated* group upon the periphery of a wheel or

drum and holding them on the periphery while a web constituting a retaining element is applied to the non-wear surface of the group of slats. The prior art does not specifically show any technique or apparatus for maintaining segregated groups of slats on the periphery of a spacing drum, and the question of validity of the Yellow patent depends upon whether this arrangement should have been obvious under 35 U.S.C. 103. While the record of the Yellow patent shows that the Patent Office granted apparatus claims going to this concept, but that the Examiner refused to allow corresponding method claims going to this concept, the Patent Office Board of Appeals affirmed this decision because they found nothing unobvious in eliminating every seventh slat, for example, in the process disclosed in Lindholm Danish patent No. 71,630, dated October 23, 1950 (Pl. Ex. 7VV). The Court of Customs and Patent Appeals in a decision, 316 F.2d 955 (C.C.P.A.1963), affirmed the judgment of the Board of Appeals. It should be noted that neither the Board of Appeals nor the Court of Customs and Patent Appeals had any jurisdiction to pass on the Yellow patent application claims which were cast in terms of apparatus rather than method claims and which had already been allowed by the Examiner, and it is not their practice to comment on any claims which are not before them, including specifically claims which had been previously allowed by the Examiner. In any consideration of the effect of the decision of the Court of Customs and Patent Appeals, one must bear in mind that in the Yellow patent application Mr. Tibbals had urged that the "method and apparatus are so correlated and intertwined that the same inventive concept can be expressed in terms of either method or apparatus" and later said that the two types of claims were "inextricably intertwined".

200. The Court agrees with the reasoning of the Board of Appeals that "there is nothing unobvious in eliminating every seventh slat, for example, in the process disclosed by Lindholm" (C.C.P.A.'s description of the Board Decision at 957), and in view of this conclusion and considering that the apparatus for grouping a plurality of slats in parallel relationship had long been used in the art, e. g., the segregating, grouping and conveying apparatus of the Rhinevault machine (Pl. Ex. 7R), or the Redin machine (Pl. Ex. 7JJ; Def. Ex. 24), it is plain that the structure defined in Claims 1 and 2 of the Yellow patent is obvious to one skilled in the art, if those claims' recitation of applying a retaining means to a *surface* of a block is deemed to read on the application of a spline (of any sort) into a recess *below* the surface.

201. The structure defined in Claims 1 and 3, read together, is in like manner obvious to one skilled in the art, as Claim 3 merely adds recitations of two conveying means, one being defined as being adapted to convey slats in a direction normal to their length located in advance of the means for placing the slats on the spacing drum—an arrangement which is fully disclosed in Lindholm and is, in fact, nothing more than a standard conveyor—and further describes means for transferring a predetermined number of slats forming a block unit from the fixed conveyor unit to the means for placing the block in contact with the assembly drum. As stated, Lindholm does not segregate slats into groups at that point, simply because he was not interested in an end product consisting of segregated groups, but, as stated above, the segregating step and apparatus for doing so are broadly old, and thus the use of such apparatus in the instant environment would be obvious to any one who desired the segregating or grouping effect.

202. While Claim 3 presents additional limitations in the form of recitations of the presence of two additional conveying means or conveyors, one arranged to segregate a predetermined number of slats that will form a block unit, such conveying means are, as noted, nothing more than conventional hardware in the art under discussion, the selection of which is

simply an exercise of choice and not a matter of invention.

203. In summation of Findings 198 to 202, the subject matter of Claims 2 and 3, both of which incorporate the limitations of disclaimed Claim 1, would as a whole have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, which was specifically some undefined time in early 1956. Consideration must also be given to the disclaimer of Claim 1 of the Yellow patent, the entry of which represents a voluntary concession that the structure defined thereby is in the public domain in so far as the patentee is concerned. Stated otherwise, regardless of the merits of arguments as to whether or not this claim defines a patentable invention, the patentee has acknowledged that it has no claim to a monopoly on the structure defined by that claim. Thus the question is presented whether the *difference* between that structure and the structure defined by Claims 2 and 3 is patentable. The only difference between the structure defined in Claims 1 and 2 is that Claim 2 particularizes that the convex slat supporting surface of Claim 1 is, in actuality, the outer surface of a freely rotatable cylinder. As Lindholm's spacing drum is freely rotatable, it is plain that the limitation presented in Claim 2 does not define an inventive limitation.

204. The Cloud machine, like the Rebick-Crothers machine and the Rebick-Klein machine which preceded it, applies the retaining element to an integrated column of slats aligned in parallel relationship. As it does not employ the segregated grouping technique of the Yellow, Blue and Black patents, it does not enjoy the substantial freedom from tolerance building problems described in the specification of the Yellow patent and, incorporated by reference into the specifications of the Blue and Black patents. Thus, while the word "grouping" may be employed in its broadest general sense to describe the Cloud machines' gathering together of a long integrated column of slats, which are, of course, a "grouping" in one sense of the word, since the Cloud machine does not segregate the slats into groups prior to the application of the wire slat, and, indeed, does not segregate the slats into groups until the moment the wire spline is cut to separate a rough block from the advancing integrated column, the Cloud machine does not employ "grouping" in the sense of the word as used in the Yellow, Blue and Black patents.

205. The claims of the Yellow patent contemplate applying a planar retaining element *to* the non-wear *surface* of a group of slats. Tibbals acknowledged that the Yellow patent does not contemplate placing a retaining element under (technically speaking, "above") the non-wear surface. The accused machine, following the teaching of Allen patent No. 1,796,880 (Pl.Ex. 7C) takes pains to avoid installing the retaining element on the non-wear surface. More particularly, it takes pains to be sure that the retaining element does not extend out to the non-wear surface, and thus takes care to avoid the "riding" difficulties that Allen warned against.

206. The claims of the Yellow patent contemplate applying the retaining element to one side of the block (we here put to one side the question of whether or not on the "surface"), while the other side is held upon a freely rotatable cylinder to obtain spacing between the longitudinal edges of the non-wear surface. As the pressure relief rollers of the Cloud machine do not serve this function, were not intended to serve this function, and cannot serve this function, the Cloud machines fail to respond to the Yellow patent claims.

207. The Yellow patent claims call for means for placing slats in contact with a cylinder, and also call for means for forcing the longitudinal edges of the slats adjacent the cylinder surface into abutment with each other, and finally for means for removing the assembled blocks from the convex surface. Even if it is assumed that the Cloud slat-pushing ram responds to one of those recitations, by the rule against double inclu-

sions (in this case it would be triple inclusions), the slat-pushing ram could not respond to all three recitations.

208. If the Cloud pressure relief roller is deemed to be the convex surface called for in Claim 1 of the Yellow patent, the structure fails to respond to the last clause of the claim because there is never an assembled block disposed on that convex surface.

209. If the Cloud stretching roller, used prior to October 1964, is deemed to be the convex surface referred to in Claim 1 of the Yellow patent, the Cloud structure fails to respond to that claim because there is no means for applying a retaining element at that point.

210. The Yellow patent must be recognized as being generally directed to a technique of stretching which is the antithesis of the stretching technique employed in the Cloud machine, and which employs a fundamentally different concept in a different manner to obtain a different result.

210A. Each of the features of the Yellow patent that can be found in the Cloud apparatus can also be found in the prior art.

211. In any event, the claims of the Yellow patent must be narrowly construed in view of the fact that this machine never obtained any commercial success of any sort, and, in fact, never went into commercial production.

213. Considering that Claims 9 and 10 of the Blue patent are method claims, and are directed to procedural steps rather than to any particular structure, and that since, according to the Plaintiff, this step consists essentially of (1) *grooving*, (2) *inserting* a spline, and (3) *cutting* within the groove, the public use of this sequence of steps by Tibbals Flooring must be recognized as a complete anticipation of this *method.*

214. Even if Tibbals Flooring's use of the method with a V-shaped spline is not deemed to be a complete anticipation, the fact remains that anyone familiar with the use of such a technique with a V-shaped spline would find it obvious to employ the same technique with wire spline in an instance where wire spline was selected as the desired type of spline. This conclusion is fortified by the fact that V-shaped spline and round wire spline had long been recognized as equivalents.

215. Claims 9 and 10 of the Blue patent read directly upon the method employed by the E. L. Bruce Co. in its commercial production of thin blocks in the 1920s.

216. The plain wording of Claims 9 and 10 of the Blue patent excludes the suggestion that they read on a technique wherein a *part* of the cut occurs a minute distance inside of one slat.

217. The plain wording of Claims 9 and 10 of the Blue patent excludes the suggestion that they read on a technique wherein *all* of the cut occurs a minute distance inside of one slat.

218. The conclusions of Findings 216 and 217 are markedly fortified by Tibbals' representations to the Patent Office in the patent specification, and in the course of the prosecution of the Blue patent, that the concept being claimed included insuring that the cut was far enough inside the slat so as to avoid contact between the end of the wire and the finishing knives.

219. In any event, the claims of the Blue patent must be narrowly construed in view of the fact that this machine never obtained any commercial success of any sort, and, in fact, never went into commercial production.

220. As has been noted, it is the genus of the claims in suit of the Blue patent that it is an advantage to cut the wires at a point sufficiently far within the confines of a terminal slat to avoid interference with the milling equipment forming the tongues and/or grooves, depending upon whether the free edges of the terminal slat are to be tongued, or are to be grooved. In view of Cloud's use of aluminum wire, this procedure offers no advantage and the Defendant does not in fact seek to enjoy that advantage or to obtain that result.

221. Considering the equivalency between wire spline and V-shaped spline, Claim 12 of the Black patent is completely anticipated by the patent to Redin and by the public use of the Redin machine.

222. Even if wire and V-shaped spline are not deemed to have the degree of co-identity as to render the Redin patent a direct anticipation, the fact remains that in view of the above-mentioned equivalency, Redin makes it obvious to one skilled in the art to practice the method of the Black patent Claim 12.

223. As Claims 1, 4 and 6 of the Black patent merely add the limitation of severing the wire short of the edges, and as this step is anticipated or obvious, the methods set forth therein, as interpreted by the Plaintiff, must be deemed to have been anticipated and obvious to one skilled in the art. And the situation is not changed if those claims are deemed to call for a grouping step, as grouping is admittedly old in the art.

224. As the Cloud machine does not obtain, or seek to obtain, any more than the minuscule, inherent deformation that always accompanies the cutting of a metal wire on a wood backing, the use of the Cloud machine does not respond to the Black patent Claims 1, 4, 6 and 12.

225. The plain wording of Claims 1, 4 and 6 of the Black patent excludes the suggestion that they read on a technique where a part of the cut occurs a minute distance inside of each slat.

226. The plain wording of Claims 1, 4 and 6 of the Black patent excludes the suggestion that they read on a technique wherein all of the cut occurs inside of one terminal slat, in a situation where no cut occurs in the other terminal slat.

227. The conclusions of Findings 224–226 are markedly fortified by Tibbals' representations in the Patent Office in the patent's specification, and in the course of the prosecution of the Black patent, that the concept being claimed includes both clinching to a significant degree and making the cuts far enough in-side the terminal slats so as to avoid contact between the ends of the wire and the finishing knives.

228. The Cloud machine does not employ the sequential severing called for in Claim 6 of the Black patent.

229. Claims 2 and 3 of the Brown patent define structure which is anticipated, and is obvious to one skilled in the art, as set forth in Findings 221 to 223.

230. Brown patent Claim 1 defines structure which is directly anticipated by the prior art, unless the word "knurled" is so strictly construed as to exclude other forms of roughening or serrating. In such a case, the change from such roughening or serration to knurling is nonetheless a step that would have been obvious to one skilled in the art.

231. Brown patent Claim 4 defines structure which is fully and completely met by the prior art, unless the word "tight" is given some special connotation and deemed to mean "knurled". And even in that instance, as set forth in the last finding, that step would have been obvious to one skilled in the art.

232. In 1931 the E. L. Bruce Company was given a patent covering any floor block composed of thin slats of wood, including square edge slats, having a kerf in the non-wear surface and having a wire spline forced into, and entirely submerged into that kerf, and maintains that wire spline in frictional engagement with the wood slats. Any lawful monopoly on that combination has long since been exhausted. Yet Claim 4 of the recently issued Brown patent, as interpreted by the Plaintiff, has essentially that same scope.

233. The term "wire-like" as employed in Claims 1 and 4 of the Brown patent must be construed as reading on any element which looks like a wire or functions as a wire, including elements which would otherwise be described as "wire rods" as in British patent to Baraclough, issued March 14, 1912 (Pl.Ex. 7TT), the serrated wires of British patent to Hughes, dated December 21, 1933 (Pl.

Ex. 7SS), and on the rubber wire-like spline of Kraft No. 2,266,464 (Pl.Ex. 7HH), or the strings of Ranta No. 2,823,-712 (Pl.Ex. 7PP).

234. The expression "stiff springy" as used in the Allen patent No. 1,796,880, is at best a relative term. Tibbals regarded Cloud aluminum wire as being somewhat "springy" and recognized that the wire used in the Blue patent was springy. All in all, Allen must be construed as teaching the use of any wire which is not limp, at one end of the spectrum, and which is not absolutely rigid, at the other end of the spectrum, and this encompasses the "flexible" wire of the Blue patent machine.

235. The Cloud block does not respond to Claims 2 and 3 of the Brown patent for the reasons set forth in Findings 224 to 227.

236. The Cloud block does not respond to Claim 1 of the Brown patent because there is no knurling in the sense of that patent.

237. The Cloud block does not respond to Claim 4 of the Brown patent because there is no tight frictional engagement in the sense of that patent.

237B. At no time during its manufacture, or thereafter, does the Cloud block have the capacity to be installed as a piece of flooring in such a way that it can accommodate irregularities of the surface on which the block rests. It follows from this that the Cloud block never meets the limitations of the last twelve words of Claims 1, 2, and 4 of the Brown patent, or of the identical recitations in the body of Claim 3.

238. The Black patent and the Brown patent must be recognized as being directed to a fundamentally different concept from that of the Cloud machine and block.

238A. While the Redin patent was considered by the Patent Examiner during the course of the prosecution of the application which matured into the Blue patent, the last mention of Redin in the file of that case was in May of 1958. As the Black patent application was not filed until January, 1958, and was not taken up by the Patent Examiner until October of 1958, there can be no assumption that the Examiner had Redin in mind during any of his considerations of the Black patent application.

238B. In the Cloud's blocks the wires do not *retain* the slats in spaced relationship to compensate for moisture expansion within the meaning of Claims 1–4 of the Brown patent.

240. In regard to the Red patent, the record specifically shows that at the pre-litigation Springfield meeting, counsel for the Defendants specifically pointed out how the Red patent's claims were limited to the provision of opposed pairs of resilient strips and means on opposite sides of the machine to adjust those strips to effect the radius of curvature —an arrangement which is not present in the machines—and that he "implored" counsel for the Plaintiff to at least simplify the controversy to the extent of withdrawing the infringement of this patent. Under these circumstances, the invocation of the Red patent by the Plaintiff and maintaining this patent in suit for 21 months, and indeed until after the formal opening of the trial, placed a completely unnecessary and unwarranted burden upon the Defendants, which cannot in any way be justified by an argument that the question of infringement was close enough as to be a matter upon which informed reasonable counsel might differ, the Defendants are entitled to an award of their reasonable attorneys' fees and disbursements for preparing for trial on the patent.

241. In regard to the Blue, Black, and Yellow patents and Claims 1–3 of the Brown patent which were kept in suit through trial, the Plaintiffs were fully aware of the reasons why those patents were plainly not infringed, and were fully aware of the limitations on the scope of those patents that had been created in their file wrappers.

250. The Court should state that during the course of the trial, the Court twice visited the plant of the Defendant and during these visits a number of tests of various sorts were performed. In each instance the tests were directed to obtaining one particular species of information, and other factors, not under immediate consideration, were disregarded. Thus, simply by way of example, when the Court was interested in determining the effect of changing the degree of projection of the knife from the knife-holders, and hence to determine the effect upon the cut of the wire if the knives depended to a lower point, no effort was made to adjust the block assembly machine so that it would render the cut at the design position, that is to say at the junction of two adjacent slats, and, in like manner, no effort was made to control spacing. Under these circumstances, it should be stated very plainly that the results of the various *experiments* should not be regarded as being typical of the production of the machines which were viewed by the Court.

## SUPPLEMENTAL CONCLUSIONS OF LAW

In furtherance of this Court's order filed November 2, 1966, and upon further consideration of the matter, the Court hereby makes the following additional Conclusions of Law:

4. The claims in suit of the Red, Blue, Black, Brown and Yellow patents have not been infringed by any of the Defendants herein.

5. The Defendants are entitled to an award of their costs.

6. Tibbals Flooring Company's invocation of the Red patent and maintaining it in suit up through the formal opening of the trial, as related in Finding of Fact 240, constitutes an exceptional case within the meaning of 35 U.S.C. § 285, and Defendants are entitled to an award of their reasonable attorneys' fees and disbursements for preparing for trial on that patent.

7. Wood Products Development Company's invocation of the Blue, Black,

Yellow and Brown patents, and maintaining them in suit through the entire trial, did not constitute an exceptional case within the meaning of 35 U.S.C. § 285, and Defendants are not entitled to an award of their reasonable attorneys' fees and disbursements.

## INTERLOCUTORY JUDGMENT

This cause having come on for hearing, and having been fully tried in open court, and the Court having been fully briefed by respective counsel, and the Court having entered Findings of Fact and Conclusions of Law, it is hereby Ordered, Adjudged and Decreed that:

1. The complaint of Plaintiff, Wood Products Development Co., Inc., and of Plaintiff, Tibbals Flooring Company, is hereby dismissed. In like manner, all of the Plaintiff's Counterclaims, which were filed when the Plaintiffs were nominally defendants, are hereby dismissed.

2. Claims 9 and 10 of the Patent No. 2,961,021, Claims 1, 4, 6 and 12 of the Patent No. 2,983,295, Claims 2 and 3 of Patent No. 3,118,804 and Claims 1, 2, 3 and 4 of Patent No. 3,128,511 are all invalid.

3. Even if deemed valid, Claims 9 and 10 of Patent No. 2,961,021, Claims 1, 4, 6 and 12 of Patent No. 2,983,295, Claims 2 and 3 of Patent No. 3,118,804, Claims 1, 2, 3 and 4 of Patent No. 3,-128,511, and Claims 1 and 2 of Patent No. 2,650,627, have not been infringed by any of the Defendants.

4. The Defendants recover of Plaintiff, Tibbals Flooring Company, a sum equal to the Defendants' reasonable attorneys' fees and disbursements in preparing for a trial on Patent 2,650,627.

5. The Defendants are not entitled to recover of Plaintiff, Wood Products Development Co., their reasonable attorneys' fees and disbursements expended in the preparation for trial of, and in the trial, briefing and arguing of, the issues relating to Patent Nos. 2,961,021, 2,983,-295, 3,118,804 and 3,128,511.

6. Jurisdiction is reserved for an accounting to determine the Defendants' reasonable attorneys' fees and disbursements in preparing for trial on Patent 2,650,627.

7. Jurisdiction is reserved for a trial of the Defendants' counterclaim, under the antitrust laws, wherein the Plaintiffs are charged, jointly and severally, with having unlawfully sought to restrain trade, and having restrained trade, by seeking to enforce the patents in suit.

8. Jurisdiction is reserved to tax costs of the Defendants in this suit to Plaintiffs by subsequent order.

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

The parties have filed timely response to the direction of paragraph V of our original memorandum opinion. Defendant has suggested that for the sake of clarity, in the event of appeal, the particular findings made by reference in the original memorandum opinion be set forth in full. Defendant presented a document entitled "Supplemental Findings of Fact" that accomplishes that purpose. Defendant also presented four additional conclusions of law to be stated and filed its suggested form for interlocutory judgment.

Plaintiff has raised some questions in regard to defendant's submissions and has independently raised other questions. This supplemental memorandum opinion will rule all questions raised in order to place this case in posture for appeal pursuant to Section 1292, Title 18, United States Code, and Rule 54(b) of the Rules of Civil Procedure.

### 1. *Supplemental Findings of Fact*

Defendant collected the appropriate findings made by reference, struck transcript references from them, changed "DPF" to "Finding" ("DPF, in the trial papers referred to "Defendant's Proposed Finding"), and corrected all typographical errors. A few changes and additions were added and deleted in order that the language read smoothly and in context

with our original findings. In a commendable manner, plaintiff's counsel assisted in checking the accuracy of defendant's efforts as to form. Plaintiff does not object to the form of the supplemental findings of fact; it of course does not waive its right to assign error in regard to those or the other findings of fact heretofore entered.

Because the mechanics of appellate review would be simplified, the supplemental findings of fact will be entered.

### 2. *Supplemental Conclusions of Law*

Plaintiff has raised some questions, both of form and substance, in regard to three of the four supplemental conclusions of law suggested by defendant. Plaintiff does not, however, contend that the subject matter of any of the suggested paragraphs should not be properly covered. We have reviewed plaintiff's arguments and have determined that they are not of sufficient merit to warrant any substantial change.

The supplemental conclusions of law will be entered in the form suggested by defendant.

### 3. *Interlocutory Judgment*

The interlocutory judgment will be entered in the form suggested by defendant. Many of plaintiff's suggestions in that regard, both of form and substance, reflect some apprehension that plaintiff's right of appeal might somehow be affected by defendant's suggested form of order. Plaintiff, for example, suggests that the judgment reflect on its face that this case was originally commenced as a declaratory judgment action and that this Court exercised jurisdiction after transfer from the District Court for the Eastern District of Tennessee. The full history of the transfer and of our pretrial orders directing that the pleadings be recast are matters set forth clearly in the record, should any one wish at some future time to contend that those questions have any remaining vitality or importance. Plaintiff, in recent correspondence with the Court, repeated its earlier trial assurance (Tr. 36) that it

raised no question and agreed that none was presented in regard to the jurisdiction or venue of this Court. Plaintiff's concern is apparently based on particular language in Agrashell, Inc. v. Hammon Products Company, 8 Cir. 1965, 352 F. 2d 443 at 447, and the apprehension that the Court of Appeals might raise some question about jurisdiction or venue on its own motion. The principle stated and applied in *Agrashell* is a familiar one. The factual situation presented by that case, however, is entirely different from that here presented. The principle stated in *Agrashell* has, in our judgment, no possible application to this case. If plaintiff believes that there is even a slight chance that the Court of Appeals might raise some jurisdictional question on its own motion, and thereby render the time and expense of the appeal on the merits a total loss, there is no reason why plaintiff could not, by appropriate motion, request a preliminary exploration of that assumed problem in the Court of Appeals before any expensive printing costs are incurred.

Plaintiff has also expressed concern as to the appealability of the proposed interlocutory judgment, directing our attention to Ronel Corporation v. Anchor Lock of Florida, Inc., 5 Cir. 1963, 312 F.2d 207. We do not believe that case, involving summary judgment, apposite to the procedural situation here presented. We believe that the interlocutory judgment to be entered is within the express language of Section 1292(a) (4), Title 28, United States Code.

In order, however, to remove any possible doubt about the appealability of the interlocutory judgment we state and certify that such order is a final judgment within the meaning of Rule 54(b) of the Rules of Civil Procedure. Experience with past appeals where such 54(b) certifications have been made (see, for example, D & L Construction Co. v. Triangle Elec. Supply Co., 3 Cir. 1964, 332 F.2d 1009 at 1011, footnote 2), convinces that plaintiff's fears concerning its right of appeal being affected by the form of the judgment are unfounded.

For the reasons stated it is

Ordered that the supplemental findings of fact and the supplemental conclusions of law this day signed be filed and shall hereafter be considered, together with those stated in our memorandum opinion of November 2, 1966, as the findings of fact and conclusions of law in this case, all pursuant to Rule 52 (a) of the Rules of Civil Procedure. It is

Further ordered that the interlocutory judgment signed this day is and shall hereafter be considered as final, within the meaning of Rule 54(b) of the Rules of Civil Procedure.

### SUPPLEMENTAL ORDER UNDER F.R.C.P. 60

It has come to the attention of the Court that while its "Supplemental Memorandum Opinion and Order" signed and entered on January 25, 1967, expressly states that the judgment being entered is a final judgment "within the meaning of Rule 54(b) of the Rules of Civil Procedure", the judgment signed contemporaneously therewith does not present an express recitation of all of the criteria set forth in that Rule.

The Court now wishing to correct this oversight or omission, and to make explicit the application of Rule 54(b), and the parties having expressly consented hereto by the signature of their attorneys as presented hereinbelow, it is hereby *ordered*:

The Interlocutory Judgment be, and hereby is, amended, nunc pro tunc as of January 25, 1967, to include a paragraph 9 which reads as follows:

"9. As there is no just reason for delay, it is hereby expressly ordered that the entry of judgment with regard to the matters set forth in paragraphs 1–5 hereinabove is final within the contemplation of the first sentence of F.R.C.P. 54(b)."